Argued February 4, reversed and remanded April 20, petition for
rehearing denied May 25, 1966

STATE OF OREGON *v.* JOHNSON, WOODS
413 P. 2d 383

*Julian Herndon, Jr.,* Portland, argued the cause and filed a brief for appellant.

*George M. Joseph,* Deputy District Attorney, Portland, argued the cause for respondent. On the brief were George Van Hoomissen, District Attorney, and Lewis B. Hampton, Deputy District Attorney, Portland.

Before McAllister, Chief Justice, and Perry, Sloan, Holman and Lusk, Justices.

PERRY, J.

The defendant Louis Woods was convicted of the crime of obtaining money by false pretenses and appeals.

In February 1964, the defendant Woods accompanied by Charles E. Johnson went to the home of a Miss Tooley in Portland. They told Miss Tooley they were "termite exterminators." She told them she didn't need anything like that, but they said they wanted to look at the house anyway. Johnson looked in the attic for termites and when he came down he brought with him a piece of wood, a two-by-four about

nine inches long, with termites in it and displayed it to her. Miss Tooley then told them to go ahead and treat the attic and paid the parties by check. They also represented that there were termites in the under-pinnings of the house and she paid them for treating this portion of the house. Evidence introduced disclosed that the attic had not been infested with termites.

Miss Tooley also testified that subsequent to the payments to Johnson and Woods two men, a Mr. Davidson and a Mr. Williams, came to her home and represented that they were detectives. These men requested of and received from Miss Tooley the cancelled checks which represented payment to the defendants Johnson and Woods for the pretended termite extermination. They also obtained additional money from her which they represented was necessary as a bond to bring back the defendants Johnson and Woods. Miss Tooley later learned that one of these men was a brother of defendant Louis Woods and that his true name was Curtis Woods, and that the other man's true name was John Bunch.

During the trial the state called John Bunch as a witness, who purportedly had been with Curtis Woods when they represented themselves as detectives and obtained the cancelled checks from Miss Tooley. John Bunch was then under indictment and awaiting trial for his complicity in the fraud practiced upon Miss Tooley. Prior to the state calling this witness to the witness stand, counsel for the defendant Woods advised the district attorney and the trial court as follows:

"MR. HERNDON: The other thing is this: I understand a Mr. Bunch has been subpoenaed by the State as a witness in this case. I have conferred

with his attorney, Mr. Donnelly. I have conferred with Mr. Bunch. He tells me he is going to take the Fifth Amendment. I contend on behalf of the defendant that with the District Attorney's office having been put on notice that he is going to take the Fifth Amendment, for them to call him and ask him questions and have him take the Fifth Amendment will prejudice the cause of our client. There are some Federal cases that say this is improper conduct of the District Attorney's office. I want to bring this to the Court's attention so there cannot be any question of our position in this matter, their calling this witness whom they know is planning to take the Fifth Amendment."

After being so advised, the state nevertheless called the witness to the stand and the following occurred:

"Q Your name is John Henry Bunch? Do you know this defendant, Mr. Woods?

"A I'm represented by counsel, and he's in the building, and he's on his way here in this matter, and so I refuse to answer on the ground that it might tend to incriminate me.

"Q To clarify the matter, you say counsel is coming now?

"A Yes.

"MR. HAMPTON: In that case, Your Honor, I wouldn't want to be responsible for proceeding if he is waiting for counsel."

After further questioning of the witness by the trial court, a recess was taken until Mr. Maxwell Donnelly, the attorney for the witness, appeared in court, when the following occurred:

"Q (By Mr. Hampton) Do you know Curtis Woods?

"A I refuse to answer on the grounds it might tend to incriminate me.

"THE COURT: Keep your voice up so the jury can hear you.

"THE WITNESS: I refuse to answer on the grounds it might tend to incriminate me.

"Q (By Mr. Hampton) Are you or have you ever been a detective?

"A I refuse to answer on the ground it might tend to incriminate me."

The defendant thereupon moved for a mistrial which was denied and the denial of this motion is assigned as reversible error.

After the jury had retired to the jury room for deliberation, and before it had returned a verdict, Mr. Donnelly, Bunch's attorney, was called to the trial court's chambers and when asked by the trial court made the following statement:

"I don't know what contacts Mr. Bunch had directly with the District Attorney or his representatives, but I had several. I think about the beginning of last week I had a phone conversation with Mr. Hampton here, and he asked me if I would phone Mr. Bunch and ask him if he would testify in these trials, and I did that and was to have called Mr. Hampton back the next day. Mr. Bunch said he would call me later and tell me whether he would or wouldn't, and so I didn't call Mr. Hampton back the next day, but I called him two or three days later and advised him that Mr. Bunch had no objection to testifying but that he felt that he didn't know anything.

"So we had some more conversations and Mr. Hampton indicated to me that he had one portion of testimony that would be valuable to the case that had nothing to do with the crime Mr. Bunch was charged with, and I said, 'If you need him, I suppose you can subpoena him and I will advise him then.'

"Then Mr. Bunch did call me and stated that he had been subpoenaed and he was down some place in California and didn't have any money to

get up here, and I talked to Mr. Hampton again and told him that Bunch declared that he didn't know anything about this and didn't want to come up. Mr. Hampton advised me he insisted he be here.

"Then I believe yesterday morning, Mr. Bunch called me from here and said that this was a case involving Mrs. Tooley, that he was accused of having stolen money from, and that the matters that they were going to ask him about—he called me, I think, from the District Attorney's office, or so he said—involved this incident and people connected with it. I said, 'The only thing that you could do would be to take the Fifth Amendment.'

"In the meantime, Mr. Herndon had called me and asked me if my man was going to testify, and I said that I had just advised him he should take the Fifth Amendment. Mr. Herndon then asked me if I would call Mr. Hampton and so advise him.

"I did call him, I think before 9:30, and told him that Mr. Bunch was going to take the Fifth Amendment on anything that had to do with Mrs. Tooley, and he said, 'Well, all right.' I said, 'What are you going to do? Can you release him?' He said, 'No.' I said, 'Are you going to call him anyway?' And he said, 'Yes, I am.'"

The defendant thereupon again moved for a mistrial, which was denied.

■ The precise question involved herein has not heretofore been passed upon by this court. However, this court has recognized the fact that reversible error is committed by permitting comment by the district attorney on the guilt of the defendant to be inferred from the refusal of a witness closely connected with the activities of the defendant to testify by invoking his constitutional right against self-incrimination. *State v. Harper,* 33 Or 524, 55 P 1075.

■ The refusal of a witness to answer questions on

the basis of his constitutional right against self-incrimination is the personal privilege of the witness, a matter over which the defendant has no control. *Beach v. United States,* 14 Sawy 549, 46 F 754, cited with approval in *State v. Harper,* supra, 33 Or 524, 527. Cf. *People v. Glass,* 158 Cal 650, 112 P 281; *Billeci v. United States,* 87 App DC 274, 184 F2d 394, 24 ALR2d 881.

■ Since the witness's right is personal and beyond the control of either the defendant or the state, it is quite clear that the exercise of the right by the witness should be treated as casting no inference either of guilt or innocence.

In *State v. Harper,* supra, this court reversed the guilty judgment because the trial court permitted the district attorney to comment upon the guilt of the defendant to be inferred from the state's witness invoking his constitutional right. In this case, the district attorney refrained from making comment. Nevertheless, it would seem equally reversible error for the state to call a witness, who it appears from prior testimony, already in the record, may have been closely associated with the defendant in the scheme to defraud, and the witness has been indicted for but not convicted of his purported participation in that scheme, when the state knows that the witness will invoke his constitutional right, and, with this knowledge, asks questions from which the jurors themselves could infer that if the questions were answered truthfully the answers would tend to establish the guilt of the defendant.

In *De Gesualdo v. People,* Colo, 1961, 364 P2d 374, 86 ALR2d 1435, 1440, the Supreme Court of Colorado clearly sets forth that it is reversible error for the

state to call an unconvicted accomplice to the witness stand for the purpose of using the witness's claim of privilege "as a circumstance against the defendant on trial," citing with approval from *Washburn v. State,* (1956) 164 Tex Cr R 448, 451, 299 SW2d 706, 708,

> "The trial court committed error in permitting the state to call the witness Nelson, a co-defendant, to the stand and require him to claim his privilege against self-incrimination and refuse to testify in the presence of the jury. Such refusal * * * could be used as an incriminating fact against the appellant."

The annotation following *De Gesualdo v. People,* supra, in 86 ALR2d at 1443, discloses that both state and federal jurisdictions agree that error is present in such circumstances, but some hold that the error is cured by properly instructing the jury. In the matter before us no instruction was given.

The state argues that the calling of a witness who is competent to testify should not be error since no one knows until the witness is on the stand that the witness will refuse to testify on the basis of self-incrimination.

■ In the present case no reasonable grounds for such belief existed, and the calling of the witness can be accounted for only on the basis of a purpose to prejudice the jury. If the state is at any time uncertain whether or not a witness will refuse to testify, this can be easily determined before the trial court in the absence of the jury and the appearance of purposeful prejudice avoided.

The defendant also sets forth numerous other assignments of error, which are without merit.

Since, however, this case must be reversed for a new trial, we take note of the fact that, over the objection of the defendant, Miss Tooley was permitted to testify to the effect that the defendant Woods on an occasion subsequent to the pretended termite extermination wished to purchase some furniture from her; that she set a price of $250, and he took the furniture, but did not pay for it.

■ This evidence would not tend to prove any of the elements of the crime for which the defendant was being tried. It was entirely incompetent and irrelevant and should not have been admitted.

■ We also note that the trial court gave extensive instructions on who is, in law, an accomplice. While the instructions are in general correct statements of the law, they are superfluous. To avoid confusion, instructions to juries should be made as short and concise as clarifying the law and the issues will permit. In the absence of the testimony of one defendant against another, the trial court should only instruct the jury that where two or more persons are charged jointly with the commission of a crime and they find from the evidence they were acting together for that purpose either one may alone be prosecuted and found guilty of all of the elements of the crime necessary to sustain a conviction. *State v. Tucker,* 36 Or 291, 61 P 894.

The judgment is reversed for a new trial.