Argued February 22, 1978, affirmed January 29,
reconsideration denied May 1, 1979

# STATE OF OREGON, *Respondent,*
*v.*
# ROBERT ALAN ARMSTRONG, *Appellant.*
## (No. 76-3725, CA 7612)
589 P2d 1174

Robert C. Cannon, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Donald L. Paillette, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Defendant was charged with murder, the indictment alleging that he

> "did intentionally and unlawfully cause the death of * * * a human being, by shooting him with a .38 caliber handgun; and, in the alternative, while engaged in the course of and in furtherance of attempting to commit robbery, and while in immediate flight therefrom, the said [defendant] did cause the death of * * * a human being, who was not then and there a participant, by shooting him with a .38 caliber handgun * * *."

Defendant was convicted of murder after a jury trial. He appeals.

### Motion to Suppress

Defendant first argues that the trial court erred in denying a motion to suppress statements he made to police prior to receiving *Miranda* warnings. He contends that the statements were made in response to "custodial interrogation," *i.e.,*

> "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

That the comments were in response to interrogation is not disputed. The sole issue is whether the trial court erred in concluding that the interrogation was not "custodial."

The pertinent facts are as follows: At approximately 10:15 p.m. on July 10, 1976, a grocery store clerk was shot and killed. Several police officers arrived at the store at about 10:30 p.m. and began an investigation. Witnesses reported hearing gunshots and seeing a man run from the store toward an apartment complex. One witness said the man was carrying a handgun as he fled. Descriptions of the man differed markedly. For example, one witness said he was black; another said he was white. Apparently no cash had been taken from the store's register.

At about 1:15 the following morning a man who lived in an apartment house near the store reported to the investigating officers that a woman who lived in the building had come to his apartment and said that the person who was responsible for the killing was in her apartment. Officers accompanied the man to his apartment and found the woman (McDaniel) talking on the telephone. She denied that she knew anything about the killing. The man—who had been drinking with defendant in McDaniel's apartment earlier in the evening and who apparently assumed that defendant was the person to whom McDaniel had attributed the killing—agreed to take the police to McDaniel's apartment and to help lure the purported killer out.

Several police officers and district attorney's office personnel went with the man to McDaniel's apartment. He knocked, and a voice from inside asked who was there. The man identified himself. The door opened and defendant walked out. The man nodded toward defendant as if to indicate he was the one the police wanted.

As defendant stepped out into the hallway, the detective in charge of the investigation told Detective Van Horn to "keep an eye on him; he is a possible suspect." Most of the officers entered the apartment, where they found another man and a woman. Defendant, Van Horn and other officers remained in the hallway. An officer asked defendant for identification. He had none. The officer asked defendant if he lived in the apartment. He replied that he did not live there and was a hitchhiker.

Detective Van Horn identified himself as a police officer. He asked if defendant had a hitchhiker's backpack. Defendant said he did not. Van Horn asked defendant's name. He replied truthfully. Van Horn then asked defendant to accompany him to the end of the hallway to get away from the activity at the door of the apartment. When they reached the end of the hallway, Van Horn frisked defendant. He found five

rounds of .38 caliber ammunition in defendant's shirt pocket. (Van Horn knew at that time that an investigator at the scene of the homicide had estimated that a cartridge he saw on the floor was .44 caliber.) Another police officer was standing with Van Horn and defendant during the frisk and throughout most of the interrogation which followed.

After Van Horn found the ammunition, he told defendant he was investigating a robbery-homicide and that the police been told the person responsible for the killing was in the apartment where he had been found. Van Horn also told defendant that things were confusing at that time and that the police were still trying to find out what had happened. He asked for defendant's full name and date of birth. Defendant answered. He asked if defendant had a gun. Defendant said "No." He inquired where defendant had got the ammunition. Defendant explained that a black man riding a bicycle had handed it to him as he walked down a nearby street sometime after 11 p.m. Van Horn remarked that that seemed unusual. He then asked defendant if he was employed, and they discussed at length defendant's service in the Marines and the circumstances of his discharge. Van Horn asked if defendant had "ever been arrested before."

In response to further questioning defendant admitted that he had been at the market earlier in the evening but denied that he had attempted to rob the store or that he had killed the clerk. When asked if he had fired a gun recently, defendant replied that he had not.

The district attorney approached defendant and Van Horn and asked to see the ammunition taken from defendant. He told defendant (truthfully) that a gun had been found in the apartment and that the ammunition found on defendant fit the gun. He stated (falsely) that defendant's fingerprints had been found on the gun. He also stated (whether truthfully or falsely is not disclosed in the record) that McDaniel

had identified him as the person who shot the clerk. He said that he knew defendant was lying about getting the ammunition from a black man on a bicycle. Defendant then admitted handling the gun found in the apartment. He said he fired it early the previous morning outside the city. He recanted his story about the black man and said the ammunition probably went with the gun found in the apartment.

When the district attorney attempted further questioning, defendant demanded that he be allowed to leave, be placed under arrest or be provided with an attorney. The questioning was discontinued. Van Horn estimated that the events described occupied 45 minutes.

Shortly after the interrogation ended, defendant asked if he could go to the police station to talk with McDaniel. She refused to speak with him. After almost two hours at the station, defendant was read the *Miranda* warnings and interrogation was resumed. The police had by then determined the gun found in McDaniel's apartment was the one used to kill the clerk.

The question presented is whether, when faced with the circumstances in which defendant found himself while being interrogated at the apartment building, a reasonable person would have concluded that his freedom was restrained in any significant way. *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978). If so, the interrogation was "custodial," and *Miranda* warnings were required.

■ Defendant was not told that he was in custody. No physical restraints were employed, nor were police weapons drawn. He was not removed to a police vehicle for questioning. When asked at the omnibus hearing if defendant would have been free to leave at any point during the interrogation, Detective Van Horn replied that he did not feel that he had probable cause to arrest defendant at that time. It is doubtful, however, that a person in defendant's position would

have felt that his freedom was not significantly restrained. When defendant stepped out of the apartment into the hallway, he was faced with numerous law enforcement officers. The man who had led the police there indicated defendant with a nod. The detective in charge said to Detective Van Horn, "Keep an eye on him; he's a possible suspect." Defendant was asked to step to the end of the hallway and was frisked by Van Horn as another officer stood by. Defendant was then questioned for 45 minutes by Van Horn and the district attorney. We conclude that the interrogation was "custodial" and that *Miranda* warnings should have been given.

■ Reversal of the conviction is not warranted unless we find prejudice resulting from the admission of the statements in violation of defendant's constitutional rights. There is very little likelihood that the statements made at the apartment building were of any significance to the jury in concluding that defendant shot and killed the clerk, either intentionally or in attempting robbery. The evidence against defendant on those issues was overwhelming.

McDaniel testified that defendant left her apartment on the evening in question carrying the loaded gun and wearing a hat and a scarf to cover his face. He was intending to rob the store, where he had seen cash during visits earlier that day. When defendant returned, McDaniel testified, he was upset and told her

> "I shot a guy. He didn't believe this was a real gun. I shot him in the ear to prove it. * * * I think I killed a guy."

Another woman who was at McDaniel's apartment late on the evening in question testified that defendant told her he had shot and killed a man. Another witness testified that defendant had solicited his help to commit a robbery on the evening in question. Defendant told his mother that he thought the shooting was an accident.

Defendant's primary defense was that at the time of the alleged offense he was suffering from a mental disease or defect and did not have the substantial capacity to appreciate the criminality of his conduct or to conform his behavior to the requirements of the law. The evidence of defendant's statements to Van Horn and the district attorney prior to *Miranda* warnings was used to rebut the testimony of defendant's main expert witness, who concluded, *inter alia,* that as a result of a mental disease or defect defendant had not had the substantial capacity to appreciate the criminality of his conduct. Specifically, the prosecuting attorney brought out on cross-examination that the expert witness had not considered defendant's statements at the apartment building in reaching his conclusion. In addition, in closing argument the prosecuting attorney pointed to defendant's statements, along with much other evidence, as rebutting the contention that defendant had not been able to appreciate the criminality of his conduct.

*Oregon v. Hass,* 420 US 714, 95 S Ct 1215, 43 L Ed 2d 570 (1975) and *Harris v. New York,* 401 US 222, 91 S Ct 643, 28 L Ed 2d 1 (1971), might be read to permit the use of the statements for the purpose of rebutting defendant's expert witness. In those cases the court held that statements obtained in violation of *Miranda* could be used to impeach the defendant's own testimony inconsistent with the earlier statements where there was no claim that the statements were coerced. The court quoted from *Walder v. United States,* 347 US 62, 74 S Ct 354, 98 L Ed 503 (1954):

> "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks doctrine would be a perversion of the Fourth Amendment. * * *" 401 US at 224.

The court concluded:

> "Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." 401 US at 225.

■ We need not determine the meaning of *Harris* and *Hass,* because defendant's statements at the apartment building were only a small part of the overwhelming evidence—both from the state's expert witnesses and from witnesses testifying as to defendant's actions before and after the alleged crime—tending to rebut the claim that as a result of mental disease or defect defendant lacked substantial capacity to appreciate the criminality of his conduct. We are satisfied beyond a reasonable doubt that admission of the statements was not prejudicial.

*Motion for Mistrial*

The state called McDaniel as a witness. After she identified herself and testified that she knew defendant, her attorney asked to be heard. He read into the record the following statement, which was agreed to by both the state and defendant:

> "Mrs. McDaniel is testifying, and in return for her testimony is receiving immunity. She will be receiving complete protection against prosecution in any crime mentioned in her testimony. There will be no prosecution nor will she be subject to any penalty or forfeiture for or on account of any fact or act for which she testifies that produces evidence."

After McDaniel had answered one more question, the prosecuting attorney stated:

> "Your Honor, as to this immunity, I believe [Mrs. McDaniel's attorney] has mentioned, I think, that the proper procedure is for Mrs. McDaniel to take the Fifth Amendment, and then the state represent—is prepared to make that offer of immunity, and the court so order, and order her to testify. I believe that's the procedure contemplated in the statute.
>
> "I have had a conversation with [her attorney] that he indicated, and I just think that's the way the statute contemplates the procedure."

The court then excused the jury in order to determine the proper procedure. Defendant moved for a mistrial. The motion was denied.

■ Defendant argues that under *State v. Johnson,* 243 Or 532, 413 P2d 383 (1966), and *State v. Abbott,* 275 Or 611, 552 P2d 238 (1976), he was entitled to a mistrial because the prosecutor called McDaniel to the stand knowing she would take the Fifth Amendment. Those cases are not applicable here. They were concerned with the danger that jurors might improperly draw inferences adverse to the defendant when a witness previously connected to the defendant refused to testify on valid Fifth Amendment grounds. There was no such danger in this case. McDaniel was granted immunity and testified fully. Defendant was not prejudiced by the prosecuting attorney's attempt to clarify the proper procedure to be followed under ORS 136.617.[1]

*Jury Instructions*

■ Defendant argues next that the trial court erred in giving one particular instruction on the issue of "partial responsibility" (ORS 161.300)[2] and in refusing to give another. Defendant asserts that the instruction given was improper under *State v. Stockett,* 278 Or 637, 565 P2d 739 (1977), because it purported to shift to the defendant the burden of proving by a preponderance of the evidence that at the time of the alleged crime he suffered from a mental disease or defect which prevented him from forming the intent which was an element of the crime charged. In *Stockett* the court held that ORS 161.305, which made the defense set forth in ORS 161.300 an affirmative defense was unconstitutional. However, defendant did not except

---

[1] We are not called upon in this case to determine the proper procedure to be followed.

[2] ORS 161.300:

"Evidence that the actor suffered from a mental disease or defect is admissible whenever it is relevant to the issue of whether he did or did not have the intent which is an element of the crime."

to the giving of the instruction, and error, if any, was not preserved. ORS 17.510.

■ Defendant contends that he requested a correct instruction on the issue of partial responsibility and that having done so, he was not required to except to the instruction actually given. Assuming he is procedurally correct, the instruction misstated the law. The requested instruction was in pertinent part as follows:

> "Evidence that the Defendant suffered from a mental disease or defect may be considered by you in determining the issue whether the Defendant did or did not have the intent which is an element of the crime charged.
> "* * * * *
> "If you find that there is evidence produced by the Defendant either from his own case in chief or which has been elicited from the State's case in chief which tends to indicate that the Defendant was suffering from a mental disease or defect as described above, then the State has the burden of disproving the mental disease or defect beyond a reasonable doubt before you can find the Defendant guilty of *either manslaughter or murder* as previously described to you." (Emphasis supplied.)

Proof of intent, however, was not required for conviction of the lesser included manslaughter offenses defined in either ORS 163.118(1)(a) or 163.125(1)(a).[3] The "partial responsibility" defense was therefore inapplicable to those offenses. *See State v. Francis,* 30 Or App 359, 567 P2d 558 (1977) *aff'd* 284 Or 621, 588 P2d 611 (1978). Defendant requested instructions under both ORS 163.118(1)(a) and 163.125(1)(a), and

---

[3] ORS 163.118(1)(a):

> "(1) Criminal homicide constitutes manslaughter in the first degree when:
> "(a) It is committed recklessly under circumstances manifesting extreme indifference to the value of human life * * *."

ORS 163.125(1)(a):

> "(1) Criminal homicide constitutes manslaughter in the second degree when:
> "(a) It is committed recklessly * * *."

those instructions were given. The requested instruction was properly refused. *State v. North,* 238 Or 90, 390 P2d 637, *cert den,* 379 US 939 (1964).

## Photographs

Defendant argues finally that the court erred in admitting into evidence photographs showing the victim's injuries after defendant had offered to stipulate to the cause of death and after a physician had testified concerning the location of the wounds, the angles of entry and the extent of injuries. (The photographs were offered before the physician's testimony, but the court deferred ruling on their admission until afterwards.) A witness testified that defendant had claimed the gun went off accidentally. The photographs, which showed precisely where the shots hit the victim, were relevant to proof of intent to kill. *State v. Coleman,* 232 Or 536, 376 P2d 416 (1962). Although perhaps gruesome, they did not introduce into the case any otherwise extraneous, inadmissible and prejudicial evidence, as did the disputed evidence in *State v. Zimmerlee,* 261 Or 49, 492 P2d 795 (1972), *State v. Wilson,* 34 Or App 429, 578 P2d 822 (1978), and *State v. Gaylor,* 12 Or App 544, 508 P2d 250 (1973).

In *State v. Jensen,* 209 Or 239, 280, 289 P2d 687, 296 P2d 618 (1955), appeal dismissed 352 US 948 (1956), the court stated:

"[T]o bring into the case wholly irrelevant evidence of a gruesome character merely for the purpose of exciting feelings of hate on the part of the jury against the defendant would be indefensible and intolerable. On the other hand, the prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce. No one would be heard to object to testimony which does no more than faithfully describe the wounds which were inflicted upon the victim of a homicide, no matter how horrifying the narration might be. But a photograph of

the corpse may fortify the oral testimony. Should it be excluded because it is, perhaps, even more revolting? We think not, as long as the defendant stands upon his plea of not guilty and the burden remains with the state of proving that the victim met death by the criminal agency alleged in the indictment."

*See also State v. Leland,* 190 Or 598, 227 P2d 785 (1951), aff'd, 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952). It was within the discretion of the trial court to admit them.

Affirmed.