Argued and submitted May 6, judgments of conviction and sentences of death affirmed July 29, 1999

# STATE OF OREGON,
*Respondent,*

*v.*

# CESAR FRANCESCO BARONE,
*Appellant.*

(CC C93066CR, C940570CR, C930806CR;
SC S42900 (Control), S42901)

986 P2d 5

See also, 891 P2d 25, 969 P2d 1013.

211-a

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, Janet A. Metcalf, Assistant Attorney General, and Holly Ann Vance, Assistant Attorney General.

David E. Groom, Deputy Public Defender, Salem, filed the brief and argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.*

RIGGS, J.

---

* Kulongoski, J., did not participate in the consideration or decision of this case.

## RIGGS, J.

This is an automatic and direct review of defendant's judgments of conviction and sentences of death. ORS 163.150(1)(g); ORAP 12.10(1). Defendant seeks reversal of his convictions on five counts of aggravated felony murder, two counts of felony murder, and one count of murder. In the alternative, defendant asks this court to vacate his sentences of death and remand for resentencing. We affirm the judgments of conviction and sentences of death.

## FACTS

Because the jury found defendant guilty, we review the facts in the light most favorable to the state. *State v. Hayward*, 327 Or 397, 399, 963 P2d 667 (1998).

The charges in this case arise from the deaths of Chantee Woodman,[1] Betty Lou Williams, and Margaret Schmidt. Woodman accepted a ride from defendant and Leonard Darcell in downtown Portland during the early morning hours of December 30, 1992. Defendant and Darcell beat and sexually assaulted Woodman, dumped her along Highway 26, and began to drive away. When they looked back, they noticed that she appeared to be alive and moving. Defendant returned, beat her with the butt of a pistol, shot her in the head, and threw her body over a guard rail. A highway worker discovered Woodman's body later that day.

Defendant was drinking with 63-year-old Betty Lou Williams at her apartment during the early morning hours of January 6, 1993. Williams went into her bathroom. Defendant followed her, produced a weapon, and began to sexually assault her. Williams suffered a heart attack and died. Defendant left Williams' partially clothed body in her bathtub, where her son discovered it the next day.

---

[1] Defendant's indictment for the murder of Chantee Woodman refers to the victim as "Dantee Elise Oshita aka Chantee Alyce Woodman." Defendant's and the state's briefs to this court refer to her as "Chantee Woodman" or "Shantee Woodman." For sake of convenience and clarity, we refer to her as Chantee Woodman in this opinion.

Margaret Schmidt was an elderly woman who lived by herself in Hillsboro. On the night of April 18, 1991, defendant entered her home, sexually assaulted her, and smothered her with a pillow. A caregiver discovered her body the next day.

Investigations into the Woodman, Williams, and Schmidt murders led police to conclude that defendant was responsible for all three. Defendant ultimately was charged with four counts of aggravated felony murder in the Woodman case, ORS 163.095(2)(d), two counts of aggravated felony murder in the Schmidt case, ORS 163.095(2)(d), and two counts of felony murder in the Williams case, ORS 163.115(1)(b).

Those charges originally were consolidated for trial with four additional counts of aggravated murder arising from the fatal shooting of a fourth woman, Martha Bryant. The state moved to sever the charges relating to the Bryant murder, and the trial court granted the motion. Before his trial on the charges in this case, defendant was convicted of Bryant's murder and sentenced to death. This court has affirmed that conviction and sentence. *State v. Barone*, 328 Or 68, 969 P2d 1013 (1998) (*Barone I*). Defendant moved three times to sever the charges relating to the Woodman, Williams, and Schmidt murders, but the trial court denied the motions.

After jury selection, defendant's trial on those charges began on November 6, 1995. Twelve jurors and four alternates were empaneled. The court gave detailed preliminary instructions outlining the jurors' responsibilities, but neglected to administer the oath to the jury.

Defense counsel and defendant noticed the court's failure to swear the jury almost immediately. To confirm his belief that the court had forgotten to administer the oath to the jurors, defense counsel, on the first or second day of trial, requested a copy of the transcript of the first day of trial from the court reporter. The reporter informed counsel that, if she provided him with a certified transcript, then she also would have to provide a transcript to the prosecutor and inform the court. Counsel then requested a rough draft copy of the transcript, which the reporter provided. Neither the prosecutor

nor the court was told that defendant had requested a transcript. The draft transcript confirmed counsel's belief that the court had not administered the oath to the jury.

After a 12-day trial, the jury retired to deliberate and returned verdicts of guilty on seven counts of the indictment. As to one charge of aggravated felony murder, the jury returned a verdict of guilty of the lesser-included offense of murder. In the meantime, however, the court had become aware of rumors that the jury had not been sworn. The court consulted the transcript and discovered its error. Before announcing the verdicts as received and dismissing the jury, the trial court described its mistake to the parties and requested motions from counsel.

Defendant then filed a "Motion To Quash Verdicts, To Declare Trial a Nullity, And To Dismiss Jury." The state filed a motion to delay acceptance and filing of the jury's verdicts. The court held a hearing on the motions. At the hearing, defense counsel stated that he was aware that the court had failed to administer the oath to the jury after the first day of trial. Defendant himself stated that he also was aware of the court's failure on the first day of trial, but had told counsel, "I want to sit on it until after the verdict comes in."

The court denied defendant's motion. In denying the motion, the court noted that defendant simply could have asked the court to administer the oath to the jury but instead had made "an intentional choice to forego that remedy." The court also stated that there was no evidence, and indeed no claim, that the jury had acted improperly in any respect. The court asked defense counsel what remedy he would prefer, short of quashing the verdict and dismissing the jury. Counsel replied that he had no preference, because no other remedy would cure the error.

The court then called the members of the jury individually and asked each of them the following questions on the record:

> "Under penalty of perjury, do you solemnly swear that the two answers you are about to give will be the truth?

"Did you well and truly try each of the three cases at issue between the parties and true verdicts reach in accordance with the law and the evidence?

"To the best of your knowledge and belief, did each and every member of the jury well and truly try each of the three cases in accordance with the law and the evidence?"

The jurors all answered "Yes" to those questions. The court then informed the jurors that it had forgotten to administer the oath, apologized, and administered the oath.

After administering the oath, the court instructed the jurors to "set aside any thoughts of the earlier verdicts" and "begin anew" to "redeliberate and arrive at verdicts in each of the three cases." The court gave the jurors new verdict forms and instructed them that they were not bound by their earlier verdicts. The jury retired to deliberate and returned with the same verdicts on all charges.[2] The court received those verdicts. After a separate penalty-phase proceeding, the jury imposed the death penalty.

Defendant challenges the verdicts, the sentences of death, and the resulting judgments, raising 19 assignments of error.[3] Three of those assignments of error pertain to the trial court's denial of pretrial motions, 11 to the guilt phase, and five to the penalty phase of defendant's trial. We arrange our discussion accordingly.[4]

## PRETRIAL MOTIONS

In his second assignment of error, defendant argues that the trial court erred in denying his motions to sever the charges related to the three homicides for which he was indicted. Defendant moved three times to sever the charges, and the trial court denied all three motions. In denying the third motion, the court stated that the prosecution would be

---

[2] The record does not indicate how long the jury took to redeliberate and return those verdicts.

[3] Defendant's counsel raised 17 of those assignments. With the court's permission, defendant filed a supplemental *pro se* brief raising two additional assignments of error.

[4] Because we arrange our discussion in this manner and because we address only briefly certain assignments of error that do not merit extended discussion, we do not address defendant's assignments of error in the order in which he presents them.

required to build a "fire wall" between the three cases and to "present the cases totally separately."

To that end, the court stated in preliminary jury instructions:

"This trial involves the presentation of three separate cases. Each case will be presented by the state separately. Each must be decided separately. The fact that three cases are being presented in one trial cannot affect the absolute requirement that you must deliberate each case separately. Evidence from one case cannot and must not be used in deciding a separate case.

"Similarly, the verdict in one case cannot affect the verdict in another. In other words, when you deliberate one case to verdict, that verdict, whether not guilty or guilty, cannot enter into deliberations on either of the other two cases."

The state made three separate opening arguments, one for each case. Then the cases were tried separately: First the Woodman murder, then the Schmidt murder, then the Williams murder. The state made separate closing arguments in the three cases. Throughout the guilt phase, the parties and the court gave the jury numerous reminders that the three charges were separate and that the state was required to prove each charge independently of the other charges.

■ ORS 132.560 governs joinder of charges and provides, in part:

"(1) A charging instrument must charge but one offense, and in one form only, except that:

"* * * * *

"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:

"(A) Of the same or similar character;

"* * * * *

"(3) If it appears, upon motion, that the state or defendant is prejudiced by a joinder of offenses under subsection (1) or (2) of this section, the court may order an election or

separate trials of counts or provide whatever other relief justice requires."

The trial court allowed joinder of the charges because they were "of the same or similar character." ORS 132.560-(1)(b)(A). Defendant does not argue that that determination was error. Rather, defendant contends that he was prejudiced by the joinder of charges and, accordingly, that the trial court should have ordered separate trials under ORS 132.560(3). We review for errors of law the trial court's determination that the facts presented in defendant's motion to sever did not show the existence of prejudice. *State v. Miller*, 327 Or 622, 629, 969 P2d 1006 (1998).

■ In *State v. Thompson*, 328 Or 248, 257, 971 P2d 879 (1999), we rejected the defendant's claim that he was prejudiced by joinder of charges because he did "not support his claim of error with arguments based on the facts of [his] case." So too here. Defendant does not explain what specific prejudice arose from the joinder of these charges. Rather, he states that it is "obvious" that joinder of the charges was "highly inflammatory" and that the "unfair prejudice of consolidating these cases was so overwhelming as to prevent the fair trial on any of these alleged crimes." He also urges that the "state should have been required to prove each case on its merits, rather than combining the cases to make defendant look guilty of multiple murders." Such general arguments, however, could be made in any case in which charges are joined. Further, the record demonstrates that the trial court did require the state to prove each case separately, on its own merits. Absent an argument of prejudice related to the specific facts of this case, we conclude, as in *Thompson*, that defendant has failed to demonstrate that he was prejudiced within the meaning of ORS 132.560(3).

■ Defendant also argues, without elaboration, that the trial court's refusal to sever the charges for trial denied him due process of law under the United States Constitution. Defendant's summary reference to "due process" is insufficient to present any specific due process argument to this court, and, accordingly, we decline to address the issue. *See State v. Montez*, 309 Or 564, 604, 789 P2d 1352 (1990) (declining to address undeveloped claim of constitutional error). The

trial court did not err in denying defendant's motions to sever the charges for trial.

In his third assignment of error, defendant challenges the trial court's denial of his pretrial motion for change of venue. The trial court originally denied that motion in September 1995. Defendant renewed the motion on the first day of jury selection, in October 1995, and the trial court again denied it. Defendant argued to the trial court that the publicity surrounding his trial and conviction for the murder of Martha Bryant was so pervasive that he could not receive a fair trial in Washington County. As evidence for that argument, defendant noted that prospective jurors' answers to the trial court's jury questionnaire revealed that a majority of the jury pool had some familiarity with defendant or with the Bryant murder generally. He also provided the court with copies of local newspaper and television reports of the Bryant murder.

In denying the motion, the trial court concluded that the questionnaires did not establish that the jurors' exposure to pretrial publicity was of such a nature that defendant could not receive a fair and impartial trial. The court noted that the remainder of the jury selection process would provide more information on that issue and stated to defense counsel:

> "It may well be you're right, that the information is of a type that a significant portion of the jurors are not going to be able to set it aside. I need to find that out for sure. I doubt that right now, but I need to find that out for sure, and I think that's part of what we will find out through this process.
>
> "So at this point, I'm going to deny that renewed motion, but I expect to hear it at least one more time after we've had some actual prospective juror input into the problem, and that will help make it clear that there is, in fact, a problem or that there is, in fact, not a problem."

Although he did not renew the motion later, defendant argues that the denial of his motion at the time that he made it was error.

■    ORS 131.355 governs changes of venue for prejudice and provides:

"The court, upon motion of the defendant, shall order the place of trial to be changed to another county if the court is satisfied that there exists in the county where the action is commenced so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

We review trial court denials of motions for change of venue for abuse of discretion. *State v. Pratt*, 316 Or 561, 570, 853 P2d 827 (1993).

■    The defendant is correct that the jury questionnaires did reveal that most prospective jurors had some familiarity with defendant or with the Bryant murder. However, juror exposure to adverse pretrial publicity does not necessitate a change of venue automatically: "[A]dverse publicity in a murder case is common and does not, of itself, necessarily make it impossible for a defendant to get a fair and impartial trial." *State v. Langley*, 314 Or 247, 260, 839 P2d 692 (1992), *on recons* 318 Or 28, 861 P2d 1012 (1993). Because defendant moved for a change of venue before individual questioning of the jury pool, the only evidence of prejudice that was before the trial court at the time of the motion was contained in the jury questionnaires. Those questionnaires reveal some general level of juror familiarity with defendant and with the Bryant murder. By themselves, however, the questionnaires are not sufficient to compel the conclusion that the jury pool was so prejudiced against defendant that seating a fair and impartial jury was impossible. Accordingly, the trial court's conclusion that the jury questionnaires did not, by themselves, indicate an unacceptable level of prejudice was reasonable. We conclude that the trial court did not abuse its discretion by denying defendant's motion for change of venue.[5]

---

[5] Defendant suggests that his argument is "buttressed" by the fact that six of the jurors who eventually served on the panel had at least some familiarity with defendant or the Bryant murder. However, defendant's motion for change of venue was made *before* the jury actually was selected. Therefore, at the time that the trial court denied defendant's motion, it did not have any information—and defendant did not make any argument—about alleged bias on the part of individual members of the jury. Accordingly, that information does not "buttress" defendant's argument that the trial court erred. Further, the trial court found, in response to defendant's

In his fourth assignment of error, defendant argues that the trial court erred in denying his pretrial motion to disqualify the trial judge. Defendant sought to disqualify the trial judge under ORS 14.250 and 14.270. ORS 14.250 provides, in part:

> "No judge of a circuit court shall sit to hear or try any suit, action, matter or proceeding when it is established, as provided in ORS 14.250 to 14.270, that any party or attorney believes that such party or attorney cannot have a fair and impartial trial or hearing before such judge."

This case was tried in the twentieth judicial district. Because the twentieth district has a population of over 100,000, motions to disqualify the trial judge must be made at the time and in the manner prescribed in ORS 14.270. ORS 14.260(4).

Defendant filed his motion to disqualify and accompanying affidavit on July 27, 1995. The trial court denied the motion at a hearing on September 19, 1995, concluding that the motion was untimely. Defendant orally renewed the motion during jury selection, and again the trial court rejected it, this time without explanation.

At the time when defendant filed his motion to disqualify the trial judge, the trial judge already had ruled on a number of motions in this case, including one of defendant's motions to sever. ORS 14.270 provides, in part:

> "No motion to disqualify a judge * * * shall be made after the judge has ruled upon any petition, demurrer or motion other than a motion to extend time in the cause, matter or proceeding * * *."

That statutory provision unambiguously requires that motions under ORS 14.270 be filed before the court has ruled on any other motion, except for a motion for an extension of time. Defendant's motion to disqualify the judge did not satisfy that requirement. It follows, as the trial court concluded, that defendant's motion was untimely. *See Oregon State Bar*

---

motion to disqualify those six jurors for cause, that none of the six was prejudiced against defendant. Nothing in the record or in defendant's arguments to this court persuades us that the court's finding on that point was error.

*v. Wright*, 280 Or 693, 705, 573 P2d 283 (1977) (motion to disqualify judge was untimely under ORS 14.270, where defendant filed motion after trial judge had ruled on motions in case). The trial court did not err in denying defendant's motion to disqualify the judge.

## GUILT PHASE

■■ In his first assignment of error, defendant argues that the trial court erred in denying his "Motion To Quash Verdicts, To Declare Trial a Nullity, And To Dismiss Jury," which he filed in response to the trial court's belated administration of the jury oath.[6] As a preliminary matter, we note that defendant's motion, however captioned, is the equivalent of a motion for mistrial. We address defendant's motion according to its substance, not its caption. *See Employee Benefits Ins. v. Grill*, 300 Or 587, 589, 715 P2d 491 (1986) (addressing motion based on the nature of the relief sought, not on the wording of the caption); *Cooley v. Roman*, 286 Or 807, 810-11, 596 P2d 565 (1979) (to the same effect). We review the trial court's denial of defendant's motion for mistrial for abuse of discretion. *State v. Larson*, 325 Or 15, 22, 933 P2d 958 (1997).

■■ As noted, the trial court neglected to administer the oath to the jury until after the jury had deliberated and returned its initial set of verdicts. ORCP 57 E governs the administration of the jury oath. That rule, which applies to criminal trials under ORS 136.210(1),[7] provides:

"As soon as the number of the jury has been completed, an oath or affirmation shall be administered to the jurors, in substance that they and each of them will well and truly try the matter in issue between the plaintiff and defendant,

---

[6] Defendant's second *pro se* assignment of error also addresses the trial court's denial of that motion. We consider the two assignments of error together, and our discussion of the first assignment of error from defendant's counsel's brief adequately addresses defendant's second *pro se* assignment of error.

[7] ORS 136.210(1) provides, in part:

"Except as provided in subsection (2) of this section, in criminal cases the trial jury shall consist of 12 persons unless the parties consent to a less number. It shall be formed, except as otherwise provided in ORS 136.220 to 136.250, in the same manner provided by ORCP 57 B, D(1)(a), D(1)(b), D(1)(g) and E."

and a true verdict give according to the law and evidence as given them on the trial."

The temporal requirement of that rule is unambiguous. ORCP 57 E requires a trial court to administer the jury oath "[a]s soon as the number of the jury has been completed,"[8] and we may neither ignore nor modify that plain statutory requirement. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). Here, the trial court did not administer the jury oath as soon as the number of the jury had been completed. It follows, as the court acknowledged at trial, that the oath was not timely administered and that the court therefore erred in that regard.

The question remains whether defendant was entitled to a mistrial as a result of that error. Defendant did not object to the untimely administration of the oath at trial and does not assign it as error on appeal. Rather, he assigns error only to the trial court's denial, on the twelfth day of trial, of his motion for mistrial. Thus, the question before us is whether, in light of its error, the trial court abused its discretion by denying defendant's motion for mistrial.

That question is a narrow one. Defendant does not argue that the oath, once administered, was in any way defective. Nor does he argue that there is any evidence of juror misconduct or anything in the record to suggest that any juror violated the substance of the oath at any point in the proceedings. Rather, he argues that, even absent any showing of specific prejudice, the untimeliness of the oath rendered the entire trial "a nullity." Under the circumstances, defendant urges, the trial court had no choice but to grant his motion. Accordingly, we must answer the question whether a trial court's untimely administration of the jury oath automatically necessitates a mistrial, even where there is no showing of case-specific prejudice to the defendant and despite any efforts the court might make to cure the error.

---

[8] The text of ORCP 57 E was adopted wholesale from an earlier statute. *See* Or Laws 1862, ch 2, § 193. The phrase "as soon as the number of the jury is completed" sounds awkward and archaic to the modern ear but, in the interest of consistency, we employ the phrase throughout this opinion.

We begin by noting that nothing in the text of ORCP 57 E requires a mistrial in a case in which a trial court administers the oath to the jury after the time specified in the rule. The rule is silent as to the remedy for such an error. The legislature at other places in the criminal code and rules of civil procedure has declared that certain procedural errors require that a new trial be granted or judgment not be entered following a verdict of guilty. *See* ORS 136.500, 135.630 (setting out grounds for motion for arrest of judgment); ORCP 64 B, C (setting out grounds for motion for new trial). However, the legislature has not prescribed such a remedy with respect to the procedural error at issue here. We do not mean to suggest that the legislature's failure to prescribe a remedy or sanction for failure to comply with the temporal requirements of ORCP 57 E means that those requirements lack significance. However, we also may not assume from the legislature's silence an intention that a mistrial must be granted following every untimely administration of the jury oath.

■ Notwithstanding the lack of a requirement for a mistrial in the text of ORCP 57 E, defendant argues that a mistrial was required on the facts of this case. Although variously iterated, defendant's claims in this assignment of error reduce to an argument that his motion should have been granted because the trial court's error naturally and inevitably affected his right to an impartial jury under the Sixth Amendment to the United States Constitution[9] and Article I, section 11, of the Oregon Constitution.[10] According to defendant, the jurors, being unsworn, were not accountable to the court, to defendant, or to one another, to follow the trial court's instructions or properly to consider the case. Because the untimely administration of the oath affected his right to an impartial jury, defendant continues, the trial court was required to grant his motion. Put another way, defendant essentially contends that, where a trial court's error affects a

---

[9] The Sixth Amendment to the United States Constitution provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

[10] Article I, section 11, of the Oregon Constitution, provides, in part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *."

defendant's right to an impartial jury, the court always would abuse its discretion by refusing to declare a mistrial.

The difficulty with that argument is that, in this case, there is no basis in this record from which to conclude that defendant's right to an impartial jury in fact was affected by the trial court's untimely administration of the jury oath. Defendant does not direct us to any evidence in the record that would support even an inference that the jury was less than impartial, and we find no such evidence. Further, the individual jurors' sworn responses to the trial court's questions indicate that the jurors in fact tried the case according to the terms of the jury oath during the period before the court administered the oath. Thus, even if defendant is correct that the untimely administration of the oath denied him a pretrial guarantee of an impartial jury, the trial court was not required to grant a mistrial on that basis, because nothing in the record suggests that defendant's case *in fact* received less than proper consideration from an impartial jury.

Defendant nevertheless asserts that a mistrial was required under case law from Oregon and other jurisdictions. He first argues that the result here is dictated by *State v. Wolfe*, 147 Or 405, 34 P2d 304 (1934). In that case, the jury was selected, but the trial court did not administer the oath. The trial court then postponed the trial and permitted the jurors to separate. When they reassembled a week later for trial, the court administered the oath but did not permit the parties to question the jurors regarding their conduct during the postponement. This court reviewed the trial court's actions for abuse of discretion and concluded that the trial court had erred in postponing the administration of the oath and the trial. *Id.* at 407.

Here, neither defendant nor the state sought to examine the jurors in that manner. The trial court conducted its own examination, however. *Wolfe* establishes that it is error requiring reversal to fail to *voir dire* a jury that was not timely sworn, at least when a party wishes to make the inquiry. But the converse of that proposition is that, if an inquiry is made and no reason appears requiring that the jury be discharged, then the error does not constitute a basis

for requiring a mistrial. Here, the inquiry was made; defendant asked for nothing more. It follows that the trial court did not abuse its discretion, and therefore did not err, in denying defendant's motion for a mistrial.

Defendant also cites case law from other jurisdictions that, he asserts, stands for the proposition that an untimely jury oath may be harmless if administered during the presentation of the case, but not if administered after the jury begins deliberations. We are not persuaded. First, jurisprudence in other jurisdictions involves statutes and rules different from our own. Second, ORCP 57 E unambiguously requires that the oath be administered as soon as the number of the jury is completed. It follows that a trial court errs if the swearing of the jury is delayed to any extent. If that error results in unfair prejudice or affects a substantial right of a party, then the trial court is without discretion to deny a motion for mistrial; if the error does not, then a mistrial is not required. We see nothing in ORCP 57 E, or in any other relevant rule or statutory or constitutional provision, to support defendant's suggestion that our analysis should depend on whether the untimely swearing occurs before or after the jury retires to deliberate.

■■ Defendant further argues that the untimely administration of the oath resulted in prejudice because the jury's second verdict, which was returned after the oath was administered, irrevocably was tainted by the first, unsworn verdict. Because of that prejudice, defendant continues, the trial court had no discretion to deny his motion for mistrial. We disagree. The trial court instructed the jurors to redeliberate and put aside all thoughts of their earlier verdicts. Although defendant asserts that the court's instruction was a "futile gesture," we assume that jurors follow their instructions, "absent an overwhelming probability that they would be unable to do so." *State v. Smith*, 310 Or 1, 26, 791 P2d 836 (1990). Here, defendant's assertions do not provide a substantial basis for concern that the jury would not follow the court's instructions. Accordingly, we conclude that defendant's argument that he was prejudiced in this respect is unpersuasive, and his contention that the trial court was required to grant a mistrial on this basis is not well taken.

■ Finally, we address a contention that defendant raised at oral argument. In response to questioning from the court, defendant argued that the apparent lack of prejudice was irrelevant in this case, because the trial court's failure to comply with the timing requirements of ORCP 57 E was the equivalent of "structural" or "systemic" error, which required the trial court to declare a mistrial. "Structural error" is a term from federal constitutional jurisprudence that refers to errors that require automatic reversal because, where such an error occurs, the trial court "cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose v. Clark*, 478 US 570, 577-78, 106 S Ct 3101, 92 L Ed 2d 460 (1986) (citation omitted). Examples of such errors are the denial of the right to counsel at trial and the denial of the right to a trial conducted before an unbiased judge. *Id.* at 577.

■ This court has not adopted the doctrine of "structural" or "systemic" error in analyzing questions of Oregon law. Even if we were to adopt it, however, the doctrine would not apply in this case. Structural error analysis applies to denials of fundamental constitutional rights in criminal prosecutions. We conclude that a delay in the administration of the jury oath is not such a denial. The jury oath is designed to vindicate a defendant's fundamental constitutional rights to a fair trial before an impartial jury. However, the temporal requirement of the oath *itself* is not such a right. Nothing in the relevant text of ORCP 57 E—"[a]s soon as the number of the jury has been completed, an oath or affirmation shall be administered to the jurors"—indicates that the temporal aspect of the oath requirement was intended to confer a "right" on the parties at all. Rather, that part of the rule appears to be designed simply to place an affirmative obligation on trial courts in their conduct of trial proceedings. Because the trial court's error did not deny defendant a fundamental right, defendant's "structural error" argument is not well taken.[11]

---

[11] It bears repeating that defendant's argument on this point is *not* that the denial of an impartial jury or of a fair trial is structural error. Rather, his argument is that the trial court's failure to comply with the timing requirements of ORCP 57 E is structural error.

In sum, we find no basis in this record from which to conclude that the trial court's untimely swearing of the jury resulted in grounds for a mistrial. Accordingly, the trial court had the discretion to remedy its error by curative efforts short of a mistrial. Where, as here, a defendant receives the benefits of the oath in the form of a fair trial before an impartial jury, the untimely administration of the jury oath, in the absence of demonstrable prejudice, is not an error that compels granting a mistrial.

In his fifth assignment of error, defendant argues that the trial court erred during jury selection in denying his request for six additional peremptory challenges. In the alternative, defendant argues that the trial court erred in denying his motion for mistrial, which motion was based in part on the court's refusal to grant those additional peremptory challenges.

The trial court allowed defendant and the state 12 peremptory challenges each. During jury selection, defendant exercised his 12 challenges. As noted, he also sought to disqualify six jurors for cause, arguing that their exposure to pretrial publicity and media accounts of the Bryant murder resulted in unfair prejudice. The trial court refused to dismiss the jurors for cause, and defendant does not assign error to that ruling.

Defendant then requested six additional peremptory challenges to allow him to remove the six jurors to whom he objected. The trial court denied the request, again stating that it believed that the six jurors in question were not biased against defendant. Defendant challenges that ruling.

ORS 136.230(1) governs peremptory challenges in criminal cases. It provides, in part:

> "If the trial is upon an accusatory instrument in which one or more of the crimes charged is * * * a capital offense, both the defendant and the state are entitled to *12 peremptory challenges, and no more.*"

(Emphasis added.) In discerning the meaning of that statutory provision, we look first to its text and context, *PGE*, 317 Or at 610-11, mindful not to omit from the statute what the legislature has inserted, ORS 174.010. In ORS 136.230(1),

the legislature has directed that defendants in capital cases are entitled to "no more" than 12 peremptory challenges. That statute disposes of defendant's objection; he received the prescribed number of peremptory challenges and was entitled to no more.

■     Defendant does not argue that ORS 136.230(1) is inapplicable to this case or that the statute is defective in any manner. Rather, he argues—as he did in his third assignment of error—that he was denied a fair trial by the inclusion on the jury of persons with some knowledge of the Bryant murder. In the context of jury selection, that argument appears to be directed more naturally to the trial court's denial of defendant's attempts to dismiss those allegedly biased jurors for cause. However, as noted, defendant does not separately assign error to the denial of his challenges for cause. In the face of the unambiguous limitation on peremptory challenges in ORS 136.230(1), the proper course for a defendant who has exhausted his peremptory challenges but who believes that there still are biased jurors on the panel is to challenge those jurors for cause, and appeal if his challenges are denied. The legislature did not empower trial courts to grant more than 12 peremptory challenges in capital cases and, accordingly, the trial court here was without discretion to grant defendant's motion.

Defendant also argues in this assignment of error that the trial court erred in denying his motion for mistrial made at the close of the state's case-in-chief in the Woodman murder. The substance of that motion was that the trial court's refusal to grant additional peremptory challenges, *combined* with the court's denial of defendant's objections to the testimony of witnesses Leonard Darcell[12] and Alyssa Lake,[13] created "cumulative" prejudice so severe as to deny defendant a fair trial.

---

[12] Defendant also moved for a mistrial at the time that the trial court denied his objection to Darcell's testimony. That motion related solely to Darcell's testimony. Defendant has challenged the denial of that motion, and we address his arguments on that point in our discussion of his sixth assignment of error.

[13] Defendant also moved for a mistrial at the time that the trial court denied his objection to Lake's testimony. That motion related solely to Lake's testimony. Defendant has challenged the denial of that motion, and we address his arguments on that point in our discussion of his seventh assignment of error.

■ Assuming without deciding that a mistrial motion of this sort—which is based on cumulative prejudice arising from three temporally and logically unrelated decisions of the trial court—might under some circumstances be successful, the trial court did not abuse its discretion by denying such a motion in this case. Defendant predicated his motion on three claims of error. The first, related to the denial of additional peremptory challenges, was not error, as discussed above. Nor were the others. As we discuss below in response to defendant's sixth and seventh assignments of error, *see* 329 Or at 229-36, the trial court did not err in admitting the testimony of Darcell and Lake. Thus, the three claims of error that predicate defendant's "cumulative" motion for mistrial are unavailing. Under the circumstances, there can be no "cumulative" prejudice of the sort defendant alleges. It follows that the trial court did not abuse its discretion in denying defendant's motion for mistrial.

In his sixth assignment of error, defendant challenges the trial court's decision to allow the state to call Darcell to testify. Darcell, the other participant in the kidnaping and murder of Chantee Woodman, was convicted of felony murder for his role in that crime. His conviction was upheld on appeal before defendant's trial on these charges. *State v. Darcell*, 133 Or App 602, 891 P2d 25, *rev den* 321 Or 246 (1995).

The state intended to call Darcell during defendant's trial for the Woodman murder to testify about defendant's role in the murder. Before Darcell was called, however, defendant moved to exclude Darcell's testimony, on the ground that Darcell had indicated that he would invoke his federal constitutional privilege against self-incrimination and refuse to testify.[14] According to Darcell's lawyer, the basis for that assertion of privilege was Darcell's belief that he might receive a new trial after a successful challenge to

---

[14] The Fifth Amendment to the United States Constitution provides, in part:

"No person shall be * * * compelled in any criminal case to be a witness against himself * * *."

The same protection also is contained in Article I, section 12, of the Oregon Constitution. However, Darcell did not attempt to invoke his Article I, section 12, privilege, and defendant does not make a separate state constitutional argument here.

his conviction through post-conviction or habeas corpus proceedings. Darcell did not want to testify, his counsel asserted, because he was concerned that his statements might be used against him in a subsequent prosecution—following a grant of a new trial—for the same crime for which he already had been convicted. At the time, Darcell had not initiated proceedings for post-conviction or habeas corpus relief.

The trial court ruled that the state could call Darcell to testify. The court first concluded that Darcell retained no Fifth Amendment privilege, because he had been convicted and sentenced and had exhausted his direct appeals. The court noted that Darcell appeared sincerely to believe that he retained the privilege based on the possibility that his conviction might be overturned. However, the court also stated that it was reasonable to conclude that Darcell had another motivation for refusing to testify, namely, a desire to protect defendant.

The state called Darcell as a witness and asked him four questions: Where he lived, whether he had seen defendant attempt to rape Woodman, whether he had seen defendant shoot Woodman, and whether, after shooting Woodman, defendant had threatened him with a gun. Darcell invoked the Fifth Amendment privilege and refused to answer. The state then asked the trial court to order Darcell to answer, and the court did so. The state again asked if Darcell had seen defendant shoot Woodman, and Darcell again refused to answer. In response, the state asked the trial court to hold Darcell in contempt. The trial court excused the jury and held Darcell in contempt. Defendant then moved for a mistrial, which the trial court denied.

■■ On appeal, defendant argues that the trial court erred in allowing the state to call Darcell. In Oregon, it generally is improper for the state to call a criminal defendant's accomplice to testify, when the state knows that the accomplice will invoke his or her Fifth Amendment (or Article I, section 12) privilege and refuse to testify. *State v. Johnson*, 243 Or 532, 413 P2d 383 (1966). However, in *State v. Abbott*, 275 Or 611, 552 P2d 238 (1976), this court created an exception to that general rule. In *Abbott*, the court held that it was not error to allow the state to call the defendant's accomplice,

who had been convicted and sentenced following a plea of guilty and had not appealed, even though the state knew that the accomplice would invoke his Fifth Amendment privilege and refuse to testify. *Id.* at 617. The court distinguished *Johnson* on the ground that the witness in *Johnson*, who had been indicted but not tried for his alleged participation in the crime with which the defendant was charged, still possessed a valid Fifth Amendment privilege. The witness in *Abbott*, on the other hand, had no ongoing Fifth Amendment privilege, because he had been convicted and his time for appeal had run. *Abbott*, 275 Or at 616. Thus, the court concluded that it was reasonable to infer that the witness was refusing to testify to protect the defendant, because the witness could not incriminate himself further by testifying about the crime. Under the circumstances, it was permissible for the state to call the witness for the sole purpose of having the witness invoke his Fifth Amendment privilege, in order that the jury might infer that the witness was protecting the defendant. *Id.* at 617.

Relying on *Johnson* and *Abbott*, the trial court in this case reasoned that the state may not put a criminal defendant's accomplice on the witness stand solely for the purpose of having the accomplice invoke the Fifth Amendment privilege in front of the jury, unless the accomplice no longer possesses a valid Fifth Amendment privilege against self-incrimination. Consistent with *Abbott*, the court further concluded that Darcell no longer possessed a Fifth Amendment privilege and allowed the state to call Darcell as a witness.

According to defendant, that ruling was error, because Darcell, unlike the witness in *Abbott*, still possessed a Fifth Amendment privilege against self-incrimination. That argument is based on Darcell's statement that he intended to attack his convictions through post-conviction and habeas corpus proceedings at some point in the future. Defendant further argues that the *Abbott* court's statement, "the witness has no privilege to remain silent, having been convicted on a plea of guilty," 275 Or at 616, does not apply to Darcell, because Darcell did not plead guilty.

██ ██ Accordingly, the question before us is whether a witness, who has been convicted of a crime and has exhausted his direct appeals from that crime, nevertheless possesses a privilege against self-incrimination and may refuse to answer questions about the crime, if he intends at some time in the future to attack his conviction through post-conviction or habeas corpus proceedings. We conclude that a witness does not possess a privilege against self-incrimination under those circumstances. The Fifth Amendment privilege against self-incrimination protects witnesses from the danger of exposing themselves to criminal liability. The privilege applies where the risk of self-incrimination is "real and appreciable," not "remote and improbable." *Brown v. Walker*, 161 US 591, 599-600, 16 S Ct 644, 40 L Ed 819 (1896); *see also Rogers v. United States*, 340 US 367, 372-73, 71 S Ct 438, 95 L Ed 344 (1951) (to the same effect). Here, Darcell's asserted risk of self-incrimination was neither "real" nor "appreciable," because at the time when he claimed the privilege, Darcell already had been convicted of the charge for which he feared prosecution. He could not incriminate himself further by answering questions about a crime for which he already had been convicted and sentenced and for which his direct appeals were exhausted. *See Mitchell v. United States*, 526 US 314, 326, 119 S Ct 1307, 1314, 143 L Ed 2d 424 (1999) ("It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final."); *Reina v. United States*, 364 US 507, 513, 81 S Ct 260, 5 L Ed 2d 249 (1960) (citing "weighty authority" for the proposition that, "once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime * * *.").

Nor did Darcell's expressed intention to seek post-conviction or habeas corpus relief in the future render the danger of self-incrimination "real" and "appreciable." Defendant in effect argued to the trial court that Darcell might in the future petition for post-conviction or habeas corpus relief, on some basis unknown to the trial court; that some or all of Darcell's claims for relief might be successful; that, as a

result, Darcell might receive a new trial; and that his testimony from defendant's trial might be used to incriminate him during that new trial. Those speculations did not—and do not—establish that Darcell faced real and appreciable danger of self-incrimination at the time when he was asked to testify. The possibility of future prosecution based on his testimony in defendant's trial was too remote to resurrect Darcell's Fifth Amendment privilege.

We also reject defendant's argument that Darcell's privilege against self-incrimination survived because he did not plead guilty. The basis for that argument is defendant's contention that post-conviction and habeas corpus relief are more likely to be granted from convictions following jury trials than from convictions following guilty pleas. Thus, the argument proceeds, if Darcell sought to attack his conviction collaterally, then he would be more likely to receive a new trial than, for example, the witness in *Abbott*, who pleaded guilty. That argument is not well taken. The contention that Darcell's risk of self-incrimination would be *lower* if he had pleaded guilty does not further the argument that his risk of self-incrimination is real and appreciable on the facts of this case.

In sum, Darcell did not possess a Fifth Amendment privilege to refuse to testify in this case. Under *Abbott*, the state could call Darcell as a witness, even knowing that he would refuse to testify. As the trial court found, the jury reasonably could believe that Darcell's refusal to testify was motivated by a desire to protect defendant. Accordingly, the inference that the state sought to establish from that refusal to testify—namely, that Darcell was trying to protect defendant through his silence—also was reasonable. The trial court did not err in allowing the state to call Darcell as a witness; nor did the court abuse its discretion in denying defendant's motion for mistrial on that ground.[15]

---

[15] Defendant also argues, without elaboration, that his "right to confrontation under the Oregon and Federal Constitutions, and his due process rights under the federal constitution were violated when the court allowed the state to go forward with Darcell." The mere invocation of those constitutional provisions, unaccompanied by substantial argument or any reference to authority, is insufficient to provide us a meaningful basis to review any specific constitutional question. Accordingly, we decline to address defendant's assertions regarding federal due process and the right to confrontation. *See Montez*, 309 Or at 604 (declining to address undeveloped claim of constitutional error).

Defendant's seventh assignment of error addresses the trial court's admission of the testimony of Alyssa Lake during the state's case-in-chief on the Woodman murder. Over defendant's objection, Lake testified as follows: Shortly before midnight on December 29, 1992, she accepted a ride from defendant and Leonard Darcell in downtown Portland. After driving a short distance, defendant drove into a parking lot so that he and Darcell could urinate. After urinating, defendant returned to the car, produced a handgun, placed the muzzle of the gun against Lake's neck, and threatened to kill her unless she performed a sexual act on him. Darcell, who knew Lake slightly, then returned to the car and pleaded with defendant not to harm Lake. The two men argued for 15 to 20 minutes, during which time defendant continued to threaten Lake with the gun. Finally, defendant relented and drove Lake to her home. At trial, Lake testified that the handgun with which defendant had threatened her resembled the handgun with which, according to the state's theory of the case, defendant had killed Woodman.

■    After admitting Lake's testimony, the trial court cautioned the jury as to the limited purposes for which it could consider the testimony. The court stated:

"This testimony was not offered and was not allowed on the issue of [defendant's] character or to prove any criminal activity against this witness by [defendant], and you may not use it for those purposes. It was allowed on the issues of the whereabouts of [defendant] at the stated time, his possible possession of a particular firearm, and the relationship between [defendant] and the person known as [Darcell]."

Defendant argues that the trial court should have excluded Lake's testimony under OEC 404(3), which bars the introduction of evidence of "other crimes, wrongs or acts * * * to prove the character of a person in order to show that the person acted in conformity therewith."[16] Such evidence

[16] In 1997, the legislature expanded the circumstances under which relevant evidence of other crimes, wrongs, or acts may be admitted in criminal actions. ORS 40.170(4); Or Laws 1997, ch 313, § 29. Neither party has raised the issue whether that provision applies in this case, and, accordingly, we do not address that issue here. *See State v. Toevs*, 327 Or 525, 530 n 2, 964 P2d 1007 (1998) (declining to address applicability of that statutory amendment in case where neither party raised the issue).

may be admitted for other, noncharacter purposes under the three-part test from *State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992):

"(1) The evidence must be independently relevant for a noncharacter purpose; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403."

(Footnotes omitted.)

As noted, the trial court admitted Lake's testimony, in part, to show that defendant had the opportunity to murder Woodman and to establish the inference that, on the night of Woodman's murder, defendant possessed the murder weapon. Defendant does not argue that Lake's testimony was irrelevant[17] or that the state did not offer sufficient proof of the acts Lake described. Rather, he argues that the third part of the *Johnson* test was not met, because the testimony was unfairly prejudicial under OEC 403.[18] Specifically, defendant argues that the evidence was prejudicial because it "cast defendant in a terrible light and would have weighed heavily in the minds of the jurors."

To be excluded under OEC 403, testimony must be not only prejudicial, but unfairly so. *State v. Moore*, 324 Or 396, 407, 927 P2d 1073 (1996). "In the context of OEC 403, 'unfair prejudice' means 'an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one.' " *Id.* at 407-08 (quoting Legislative Commentary, cited in Laird C. Kirkpatrick, *Oregon Evidence*, 125

---

[17] Parts of defendant's brief to this court might be construed as challenging the relevance of Lake's testimony. However, defense counsel conceded its relevance before the trial court, stating: "I don't argue with the fact that the evidence is relevant for the two purposes the Court has indicated * * *." Consequently, the question of relevance is unpreserved. To the extent that defendant's brief to this court raises that issue, we decline to address it.

[18] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

(2d ed 1989)). Further, the probative value of the evidence must be *"substantially* outweighed by the danger of unfair prejudice." OEC 403 (emphasis added).

We conclude that the probative value of Lake's testimony outweighed the danger of unfair prejudice. The testimony was helpful to the jury's consideration of a number of relevant issues. As the trial court concluded, the testimony placed defendant and Darcell in a car in downtown Portland just hours before Woodman was taken from downtown Portland and murdered. It also tended to establish the inference that defendant possessed the murder weapon on the night of Woodman's murder.

■ Further, any prejudicial effect of the testimony was blunted by the trial court's limiting instruction. The court clearly instructed the jury to consider the evidence only for the specific purposes for which it was admitted. Jurors are assumed to follow the court's instructions, *Smith*, 310 Or at 26, and the record provides no basis on which to conclude that they were unlikely to do so in this case.

■ In sum, we conclude that the probative value of Lake's testimony outweighed the danger of unfair prejudice. Accordingly, the third prong of the *Johnson* test is satisfied, and the trial court did not err in admitting the testimony under OEC 404(3).[19]

In his tenth assignment of error, defendant argues that the trial court erred in admitting testimony concerning a letter that defendant wrote during trial. The state called an employee of the jail where defendant was housed, who testified that she had intercepted a letter from defendant to a fellow inmate. Over defendant's objection, the employee read the following passages from the letter:

"Anyways, rats testified today, as did the state crime lab.

---

[19] Defendant also moved for a mistrial based on the trial court's admission of Lake's testimony. However, defendant did not make that motion until the fourth day of trial. Lake testified on the second day of trial. Therefore, defendant's motion was untimely and is unpreserved. *See, e.g., Barone I*, 328 Or at 90 ("To preserve error, a motion for mistrial must be made timely, *i.e.*, it must be made as soon as the objectionable statement or event occurs.").

"* * * * *

"Ask Pope[20] if he remembers asking *me* if I needed a hand. That I said no—(and it was something you and I spoke briefly about.) But now you can tell him yes—that his friend, James Lord, who is at [Eastern Oregon Correctional Institution], doesn't want to be coming back here to testify, but doesn't know how to *stop* doing so. Maybe Pope knows somebody that can teach him how to research the problem, and come to an agreeable solution. That this would be most helpful, and it's *ASAP*.

"* * * * *

"P.S. When you write back, just tell me if Pope says yes or no. I need to know ASAP so I know where to go in dealing with it. It *is* important."

(Emphasis in original.) The quoted parts of the letter were dated November 9, 1995. At the time, James Lord had testified once, during the state's case-in-chief on the Woodman murder. He subsequently testified again, during the state's case-in-chief on the Schmidt murder.

Defendant objected to the testimony about his letter on the ground that it was irrelevant under OEC 401[21] or, if relevant, then was unfairly prejudicial under OEC 403. The trial court overruled defendant's objection, stating that the letter reasonably could be construed as an attempt to engage a fellow inmate to take action against Lord, in order to stop him from testifying further. Under that construction, the court concluded, the letter was relevant, because it led to an "inference of consciousness of guilt" on defendant's part. The court further concluded that the evidence was not unfairly prejudicial under OEC 403. Defendant assigns error to both rulings.

We review trial court determinations of relevance under OEC 401 for errors of law. *State v. Titus*, 328 Or 475,

---

[20] The transcript reflects that the witness read the name in the letter as "Hope." However, the letter in fact refers to "Pope."

[21] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

481, 982 P2d 1133 (1999). OEC 401 establishes a "very low threshold" for the admission of evidence; evidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action. *State v. Hampton*, 317 Or 251, 255 n 8, 855 P2d 621 (1993).

■ Defendant argues that the testimony concerning the contents of his letter was not relevant because the quoted parts of the letter are vague and subject to more than one interpretation. However, the state's interpretation of the letter as a veiled request by defendant for another inmate to take steps to stop Lord from testifying again is reasonable, if not compelled. *See Titus*, 328 Or at 481 (evidence susceptible to multiple inferences admissible if inference desired by proponent is reasonable). Defendant was free to argue at trial that the letter in fact had another meaning. Under the state's construction, the letter was relevant to establish an inference of defendant's consciousness of his guilt in the Woodman and Schmidt murders. *See Barone I*, 328 Or at 92 (evidence leading to reasonable inference of the defendant's consciousness of guilt relevant). The trial court did not err in admitting the testimony under OEC 401.

■ Nor did the trial court abuse its discretion in rejecting defendant's argument that the evidence was unfairly prejudicial under OEC 403; the probative value of the evidence outweighed any limited prejudicial effect, as the court concluded. In sum, the trial court did not err in admitting testimony concerning the contents of defendant's letter.[22]

In his twelfth assignment of error, defendant argues that the trial court erred in denying his motion for mistrial. The basis for defendant's motion was the trial court's jury instructions on the charges of aggravated felony murder and felony murder.

The elements of felony murder are set out in ORS 163.115(1)(b), which provides, in part:

---

[22] In his brief to this court, defendant also suggests that the evidence was inadmissible under OEC 404(3). However, defendant did not make an OEC 404(3) argument to the trial court and, to the extent he makes such an argument to this court, we decline to consider it for the first time on appeal.

"(1)   Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"*  *  *  *  *

"(b)   When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and *in the course of and in furtherance of the crime* the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants * * *."

(Emphasis added.) Aggravated felony murder occurs when "the defendant personally and intentionally commit[s] the homicide under the circumstances set forth in ORS 163.115(1)(b)." ORS 163.095(2)(d). As noted, defendant was charged with six counts of aggravated felony murder and two counts of felony murder.

During closing arguments, the state argued to the jury that, under the felony murder and aggravated felony murder statutes, the murder must be committed during the course of *or* in furtherance of the underlying felony on which the felony murder charge is based. In his closing arguments, defendant argued that the state was required to prove that the murders had been committed during the course of *and* in furtherance of the underlying felonies. According to defendant, that was a logical impossibility in these cases, because none of the underlying felonies—kidnaping, attempted rape, and sexual abuse—could be "furthered" by murder.

Before the state's rebuttal closing argument, the parties and the trial court discussed the requirements for proving felony murder. The trial court ultimately agreed with the state that the statutes required proof that the murder had been committed during the course of *or* in furtherance of the underlying felony. The court then informed the parties that the jury instructions would reflect that interpretation of the relevant statutes. Defendant objected to the court's decision to instruct the jury in that manner.

The state then made its rebuttal closing arguments. During those arguments, the state exhorted the jurors to

"[l]isten to the court's instructions" and urged that defendant "wants [the jury] to misunderstand the law." The state also made the following statements relevant to this issue:

"I submit to you that you're going to hear that the crime of aggravated murder, you look for the kidnaping, that it occurred in the course of *or, or* in furtherance of the commission of the crime.

"* * * * *

"* * *[Defendant], in his argument, has basically told you, rather subtly, 'Well, don't convict him of this, because the state hasn't proved that it was in the course of *and* in furtherance.' But you know that the instruction is '*or* in furtherance of.' And he's kind of—I don't want to characterize his argument. You have to characterize his argument. But he's kind of left it, 'Well, if you don't buy the rest of my argument, yeah, maybe he was involved in the kidnaping, and, yeah, maybe he intentionally did it, but it doesn't add up to this.

"Well, I submit to you it does. When the judge explains to you the jury instructions, you will realize that this is what Mr. Barone did. He was involved in the kidnaping of Miss Woodman, and he, himself, intentionally killed her. That's aggravated murder.

"* * * * *

"The argument that this wasn't done in the course of and in furtherance of a burglary or that it wasn't done in the course of and in furtherance of an attempted rape is ludicrous. You're being misled. Don't be misled. In the course of: This killing was in the course of a burglary. It was in the course of an attempted rape."

(Emphasis added.) Defendant did not object to any of those statements.

The trial court then instructed the jury. In setting out the elements of felony murder and aggravated felony murder, the court consistently instructed the jury that the state was required to prove that the murders were committed "in the course of *and/or* in furtherance of" the underlying felonies. (Emphasis added.) Defendant took exception to the court's instructions on that point.

After the jury retired to deliberate, the parties and the court recessed. When the court reconvened, the jury still had not returned with its verdicts. At that point, the prosecutor informed the court that he never before had been confronted with defendant's "and/or" argument. On reflection, the prosecutor conceded that his argument in response had been "erroneous" and that he believed that the court had instructed the jury incorrectly on the elements of felony murder and aggravated felony murder.

The court then asked defendant if he wanted the court to reinstruct the jury on the elements of the charged offenses. After a consultation between defendant and defense counsel, defendant instead moved for a mistrial. He asserted two grounds for that motion: The allegedly erroneous instruction and the prosecutor's comments during rebuttal closing, which counsel characterized as "a direct attack on my credibility." The trial court denied the motion for mistrial. Defendant then asked the court to reinstruct the jury, and the court agreed.

By that time, the jury had returned with verdicts. The court took the verdict forms from the jury, but neither read nor received them. The court then informed the jury that the felony murder instruction that it had given was erroneous, described the nature of the error, and stated that the jury would have to retire with new verdict forms to redeliberate. Next, the court reinstructed the jury on the elements of felony murder, this time clarifying that the state was required to prove that the murder was committed in the course of *and* in furtherance of the underlying felony. So instructed, the jury retired to deliberate with new verdict forms. After deliberating, the jury returned verdicts of guilty on the two charges of felony murder and on five of the charges of aggravated felony murder, and, as to the remaining charge of aggravated felony murder, a verdict of guilty of the lesser-included offense of murder. The jury noted on its verdict form that it had changed its verdict on that final charge from guilty of the charged offense of aggravated felony murder.

Defendant assigns error to the trial court's denial of his motion for mistrial. As he did before the trial court, defendant makes two independent arguments in support of his

motion. First, he argues that the trial court's original instruction "misstated the law" and that the "bell could not be unrung by a curative instruction, so a mistrial was necessary." Second, he argues that the prosecutor's comments during rebuttal closing "belittled" defense counsel to the detriment of defendant, and that a mistrial was required to cure the resulting prejudice.

That second argument is untimely and, therefore, unpreserved. As noted, a motion for mistrial must be made "as soon as the objectionable statement or event occurs." *Barone I,* 328 Or at 90. Here, defendant's second argument in support of his motion relates solely to comments made during the state's rebuttal closing argument. In the interval between the last of those comments and defendant's motion, the prosecutor completed his closing arguments, the trial court instructed the jury, the jury retired to deliberate, the court recessed, the court reconvened, there was a colloquy between the court and counsel for the parties, and defendant consulted with his lawyers. That interval was too great; defendant did not make his motion promptly after the objectionable event occurred and, consequently, failed to preserve his second argument in support of his motion for mistrial.

We turn to whether the trial court abused its discretion by rejecting defendant's first argument in support of his motion for mistrial. As an initial matter, we agree that the original instructions were erroneous, as the trial court ultimately concluded. ORS 163.115(1)(b) plainly requires the state to prove that the murder was committed "in the course of and in furtherance of" the underlying felony. There was no basis in the statute for the trial court's "and/or" instructions.

According to defendant, that error required the trial court to grant a mistrial. Defendant argues, without elaboration, that the trial court's second set of instructions—which correctly described the law—were insufficient to overcome the effect of the initial, erroneous instructions. We disagree. We will not assume that the jury failed to follow the correct instructions—which were clear and straightforward—absent some compelling argument that the jury was incapable of doing so. *Smith,* 310 Or at 26. Defendant has not made such an argument. The trial court's reinstruction on the elements

of felony murder was sufficient to remedy the original error and, consequently, the court did not abuse its discretion by denying defendant's motion for mistrial.

## PENALTY PHASE

Defendant's fourteenth assignment of error addresses the trial court's admission during the penalty phase of testimony reflecting defendant's attitude toward the "Green River Killer." The state called as a witness Timothy Woodruff, an inmate who was incarcerated with defendant. Woodruff testified that defendant had stated "that he thought [the Green River Killer] was just a punk. You know, compared to [defendant], he was a punk."

Defendant argues that that testimony should have been excluded because it was more prejudicial than probative under OEC 403. We review trial court rulings on the admissibility of relevant evidence under OEC 403 for abuse of discretion.[23] *State v. Rose*, 311 Or 274, 291, 810 P2d 839 (1991).

We conclude that the trial court did not abuse its discretion by admitting Woodruff's testimony. Even if defendant's statements could support other permissible inferences, the statements reasonably could be construed as revealing that defendant measured his crimes against those of other murderers and took pride in his violent acts. Accordingly, Woodruff's testimony tended to demonstrate defendant's affinity for violent crime and was probative of defendant's future dangerousness under the second question from ORS 163.150(1)(b).[24]

---

[23] In his brief to this court, defendant also argues that Woodruff's testimony was irrelevant under OEC 401. However, defendant did not argue at trial that the testimony was irrelevant, and we will not consider that argument for the first time on appeal. *See Moore*, 324 Or at 407 (prejudice argument under OEC 403 not sufficient to preserve relevancy objection under OEC 401).

[24] ORS 163.150(1)(b) provides:

"Upon conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

244

■ Nor was the probative value of the evidence substantially outweighed by the danger of any unfair prejudice. Defendant suggests that the mention of the Green River Killer "would instill in the jury a fear of unprosecuted killers, and would perhaps allow the jury to draw the conclusion that defendant was somehow connected to those Washington serial killings." Even granting that the mention of the Green River Killer might have had some such unfair prejudicial effect—a contention that seems to us to be dubious, at best—the probative value of the testimony was greater. As noted, the testimony supported the inference that defendant took pride in his violent acts and measured himself against other murderers. That inference certainly could figure into the jury's determination on the second question. Defendant's speculations about possible unfair prejudice do not persuade us that the evidence should have been suppressed under OEC 403.

In his fifteenth assignment of error, defendant challenges the trial court's admission, over defendant's objection, of photographs taken during the autopsy of Bryant. Defendant argues that the photographs were irrelevant and unfairly prejudicial under OEC 403.

■ The state argues that the photographs were relevant to the jury's determination of the probability that defendant would "commit criminal acts of violence that would constitute a continuing threat to society." ORS 163.150(1)(b)(B). We agree. ORS 163.150(1)(b)(B) "permits the introduction of a broad range of evidence," *Moore*, 324 Or at 416, including a defendant's entire previous criminal history, *State v. Moen*, 309 Or 45, 73, 74-76, 786 P2d 111 (1990). "To be admissible under the second question * * * the proffered evidence must have a tendency to show that a probability either does or does not exist that the defendant will commit criminal acts of violence that would constitute a continuing threat to society." *Moore*, 324 Or at 417.

We have no difficulty concluding that the proffered evidence meets that standard of relevance. The photographs

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

were evidence of the brutality of defendant's attack on Bryant and supported the prosecution's contention that defendant posed a continuing threat to society. Further, the photographs were evidence of "the range and severity of a defendant's prior criminal conduct," which also is probative of future dangerousness. *Moen*, 309 Or at 73.

■ The remaining question is whether the photographs were unfairly prejudicial under OEC 403. In *Barone I*, this court held that the same photographs were not unfairly prejudicial under OEC 403, stating that although "the photographs in question were graphic, they could not be said to be remarkable in the context of a murder trial." 328 Or at 88. We carefully have considered defendant's arguments in this case and again conclude that defendant was not unfairly prejudiced by the introduction of the photographs. Accordingly, the trial court did not abuse its discretion in admitting them into evidence.

### ADDITIONAL ARGUMENTS AND ASSIGNMENTS OF ERROR

We carefully have considered defendant's remaining arguments and assignments of error and conclude that they already have been resolved against defendant or are not well taken. An extended discussion of those arguments and assignments of error would not benefit bench or bar, and we reject them without further discussion.

The judgments of conviction and sentences of death are affirmed.