IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2004

## STATE OF TENNESSEE v. FRANKLIN HOWARD

**Appeal from the Criminal Court for Shelby County
No. 95-07822     Joseph B. Dailey, Judge**

---

**No. W2002-01680-CCA-R3-CD  - Filed November 18, 2004**

---

Following a remand for a new trial on the charge of first-degree premeditated murder, *see State v. Howard*, 30 S.W.3d 271 (Tenn. 2000), the defendant, Franklin Howard, was again convicted of first-degree premeditated murder and was also convicted of felony murder and sentenced to life in prison. Now on appeal, he challenges the sufficiency of the convicting evidence, the admission of a co-defendant's statement, the failure of the trial court to bar the second trial based upon principles of double jeopardy, the trial court's jury instructions, the failure to transfer the case to another trial judge for retrial, and the imposition of consecutive sentencing. We reverse the felony-murder convictions and dismiss those charges but otherwise affirm the defendant's first-degree murder conviction and sentence.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed in Part; Reversed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Joseph S. Ozment, Memphis, Tennessee, for the Appellant, Franklin Howard.

Michael E. Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Robert C. Carter and Jennifer Nichols, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The evidence at retrial established, in the light most favorable to the state, the following facts. The homicide victim, Gene Frieling, was an employee of TGI Fridays (TGIF) restaurant chain and was transferred to Memphis to participate in the management of a TGIF location. In the early morning hours of January 28, 1995, a 9-1-1 emergency call alerted police of "shots fired" at the TGIF location. Upon arriving at the scene, officers discovered the deceased victim, sitting in the floor near the office. He had suffered a gunshot wound in his shoulder that

penetrated his lungs and heart. A second man, Preston Shea, was beneath a counter in the office. Mr. Shea, the TGIF bartender on duty when the restaurant closed, had been shot multiple times, although he ultimately survived the shooting.

The restaurant's office was accessed from the rear of the restaurant by a door and a short hallway. The door could be opened from the inside via an "alarm type" handle but, when closed, could not be opened from the outside. Officers recovered nine-millimeter shell casings and two .380 shell casings from the office area. They also recovered a bullet fragment from the person of Mr. Shea. The officers were unable to extract fingerprints from the crime scene. A regional TGIF executive came to the scene and determined that, at the time of the assault, the victim had been preparing to deposit the day's receipts and that, based upon cash register records, approximately $5,400 was missing.

John Paul Wong testified that he was working as a dishwasher at TGIF during the evening of January 27 and early morning hours of January 28, 1995. His duties entailed taking refuse to the dumpster behind the restaurant after closing and just before the restaurant was secured for the night. He exited the rear of the building via the hallway and the one-way door. In making his first trip to the dumpster, he propped open the door with a broom, a common practice among employees who went outside, intending to re-enter the building. As he started out the door with the second haul of refuse, he was "pounced upon" by four dark-clothed intruders wearing ski masks. Someone shoved a gun in his face, threatened to shoot him, and pushed him back into the hall where he was placed face-down on the floor. Shortly thereafter, a waitress, Jessica Hoard, was placed on the floor near Mr. Wong. Then, Mr. Wong heard shots and people running. After the intruders left, Mr. Wong found the homicide victim and Mr. Shea wounded and lying on the floor. He propped up the homicide victim.

Jessica Hoard testified the restaurant closed at 1:00 a.m. She was waiting for the victim, who had to balance the account and prepare the bank deposit. At approximately 2:00 a.m., a man in dark clothes and a ski mask and brandishing a gun appeared in the rear doorway. A second man threatened to shoot Ms. Hoard and ordered her to lie on the floor. She saw a third man standing at the rear door. Soon, she heard shots and screaming.

Preston Shea testified that, as the head bartender when the restaurant closed, he was helping the manager, Mr. Frieling, account for the receipts. Upon walking out of the office, he encountered four masked, armed men in the hall. One of them hit Mr. Shea in the head with an object, and he fell to the floor near the rear door. The men demanded money, and Mr. Shea gave them his wallet. Some of the men went into the office and passed the restaurant money out to the other men in the hall. Someone said, "Shoot the m - - - - - f - - - - -," and then a shot was fired. As the intruders left through the hall, Mr. Shea was shot. He testified, "I got shot three times for lying there in a pool of kitchen slop doing exactly what they asked." When the men left, Mr. Shea crawled into the office and called 9-1-1.

-2-

Darrick Jones testified that he worked at TGIF on the evening of January 27 until the restaurant closed at 1:00 a.m. When he went to his car parked in the rear about 1:30 a.m., he saw a white Pontiac Bonneville or Parisian with a dark top pass through the parking area. The car contained at least four people.

On February 7, 1995, based upon Mr. Jones's information and a Crime Stoppers tip, officers stopped a white Pontiac driven by Claude Sharkey. A young man named Anthony Moore, also known as Anthony Morgan, was riding in the Pontiac. The officers found a .380 automatic pistol containing seven live rounds hidden under the Pontiac's dash board. Within a short time, officers apprehended Claushaun Sharkey and Kevin Wilson, and pursuant to statements given by these men, they went to the defendant's residence. Upon finding the defendant at home and after obtaining permission to search the house, the officers found a .32 revolver in a box under the defendant's mother's bed, a black leather jacket, and a ski mask.

Apparently prompted by being shown Wilson's prior statement wherein he implicated the defendant, the defendant told the officers, "I was there, but I didn't go inside." He gave a written statement in which he recounted that the Sharkeys and Wilson were responsible for the TGIF robbery and homicide. He admitted that, although he had been asleep in the car, after the other three men discussed robbing TGIF, he "walked up there" with them. He stated, "I stayed all the way in the back and they ran in the restaurant and I heard some shots fired so I ran to the car . . . ." The defendant recounted that, after returning to the Sharkeys' house, the men gave him $200.

A forensics analyst testified that he could discern no identifiable fingerprints on the .32 revolver. He analyzed a .380 bullet recovered from the victim and a .380 shell casing found at the crime scene and determined that they were fired from the .380 pistol recovered from the Sharkeys' Pontiac. The officers had also recovered a nine millimeter bullet fragment but found no evidence of projectiles being fired by a .32 pistol.

In his defense, the defendant called his mother, who testified that the .32 revolver belonged to her and that she never knew of the defendant taking it. He also called Claude Sharkey's ex-girlfriend, who testified that she had never known the defendant to have been a part of the group of the Sharkeys, Kevin Wilson, and Anthony Morgan, the four of whom were "running buddies."

Anthony Morgan, Kevin Wilson, and the two Sharkeys testified for the defendant. Morgan testified that the defendant was not a "running buddy" of the Sharkeys. He denied the truth of his prior statement that, on Saturday, January 28, 1995, the defendant was at the Sharkeys' home when Morgan arrived.

Wilson testified that he, the two Sharkeys, Morgan, and the defendant were all in the Pontiac in the early morning hours of January 28, 1995. Claude Sharkey suggested robbing TGIF. The defendant and Morgan stayed in the car, and Wilson testified that the defendant stated that he would having nothing to do with the robbery. Wilson testified that he and Claude Sharkey had guns. He heard Claude Sharkey's gun fire but did not see him shoot the manager. Wilson did not shoot

the manager but did shoot the bartender, although he claimed he did so unintentionally. Wilson admitted that his prior statement was contradictory to his trial testimony but maintained that he was scared when he made the false statements in his pretrial statement. Wilson acknowledged that his prior statement said that the defendant entered TGIF with the other men, that the defendant had a pistol, that the pistol resembled the one removed from the defendant's house, and that the defendant and Claude Sharkey told Wilson to shoot the bartender; however, Wilson testified that these statements were untrue and that the defendant never left the car.

Claushaun Sharkey testified that he and Claude Sharkey, the defendant, Kevin Wilson, and "Little Anthony" Morgan had been together during the day and evening of January 27, 1995, smoking marijuana, drinking, and playing video games. Claude suggested that they rob TGIF. The five of them traveled to the location, but the defendant was too drunk to get out of the car. Wilson, Claude Sharkey, and "Little Anthony" had guns; Claushaun Sharkey did not. Claushaun Sharkey acknowedged that his pretrial statement said that the defendant, rather than "Little Anthony" Morgan, entered TGIF with the other three men, but he attributed the statement to pressure from the police. He further acknowledged that his statement claimed that the defendant stood over Preston Shea and took his wallet and that the robbery had been discussed among the group before going to the TGIF. In his trial testimony, he denied the truth of these statements.

Claude Sharkey testified that he spent time drinking and smoking marijuana with the other four men on January 27, 1995. Although he had been thinking about robbing TGIF, he had not discussed the idea with anyone prior to everyone getting into the Pontiac that night. Although he was supposed to be taking everyone home, he intentionally took an expressway exit that led to TGIF. Once there, he parked, told the others of his plans, produced a few ski masks, and asked who wanted to go. "Little Anthony," Wilson, and Claushaun Sharkey opted to go, but the defendant was "too drunk." He never saw the defendant leave the car. Claude Sharkey testified that he and Wilson entered the office. He said, "I went in. I asked for money. [The victim] gave it to me, and I still shot him." He testified that he had told no one that he was going to shoot anyone during the robbery. Sharkey then testified that he and Wilson both shot the bartender. He acknowledged that in his pretrial statement, he said that the defendant came into TGIF and took the money and that he testified in a previous trial that the defendant carried a gun. He testified that these statements were untrue and that he made them in consideration of the state's promise to provide a helpful letter to the parole board.

The defendant testified that, although he spent time with the Sharkeys, Wilson, and Morgan on January 27, 1995, there had been no plan to commit a robbery. Although he thought they were driving him home that night, he was drunk and fell asleep. The Pontiac took the "wrong exit" and arrived at TGIF. When the robbery plan was discussed at TGIF, the group rebuffed his attempts to get them to take him home. He testified that they told him to stay in the car until they came back. When the men returned, Wilson admitted shooting someone. The defendant testified that he had never removed his mother's .32 pistol from their house. He claimed his pretrial statement was the result of being scared when the officers "put[] their hands on [him]." He testified that, following the robbery, he received $200 in "hush" money.

-4-

Based upon this evidence, the jury convicted the defendant of premeditated first-degree murder and of two modes of felony first-degree murder. The trial court merged all verdicts into one first-degree murder conviction and imposed a life sentence.

## I. Evidence Sufficiency.

In his first issue on appeal, the defendant claims that the evidence is insufficient to establish that the victim was killed premeditatedly and deliberately. *See* Tenn. Code Ann. § 39-13-202(a) (1991) (first-degree murder is an "intentional, premeditated and *deliberate* killing of another") (emphasis added) (amended, Acts 1995, ch. 460 (effective July 1, 1995)).

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). This court does not substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

At the time of the offense in question, January 28, 1995, the premeditated form of first-degree murder was defined as the "intentional, premeditated and deliberate killing of another." *See* Tenn. Code Ann. § 39-12-202(a) (1991) (amended, Acts 1995, ch. 460 (effective July 1, 1995)).

> The element of premeditation requires a previously formed design or intent to kill. Deliberation, on the other hand, requires that the killing be done with a cool purpose - - in other words, that the killer be free from the passions of the moment. Moreover, as indicated in our recent opinion in *State v. Brown*, [836 S.W.2d 530, 543 (Tenn. 1992),] the fact that "premeditation can be formed in an instant" must be viewed in contrast to the element of deliberation, which obviously cannot be formed "instantaneously." While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, *Brown* requires more than a "split-second"

of reflection in order to satisfy the elements of premeditation and deliberation.

*State v. West*, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted).

In bidding to overturn his premeditated murder conviction, the defendant argues in his brief that "[t]here is simply no evidence in the record to support premeditation, deliberation or intent on the part of the defendant to commit the offense of [p]remeditated [f]irst [d]egree [m]urder. . . . [T]here is no evidence . . . that [the defendant] fired a gun or even had one with him." As such, the defendant's argument fails to account for a statutory complicity theory of the defendant's vicarious liability for the premeditated homicide of the victim. "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402 (2003). If the evidence is sufficient to show that the active perpetrator premeditatedly and deliberately killed the victim and that the defendant was criminally responsible for his act pursuant to Code section 39-11-402, then that evidence establishes the defendant's guilt of premeditated murder. *See State v. Berry*, 141 S.W.3d 549, 565 (Tenn. 2004) ("A person found criminally responsible for an offense committed by another is guilty to the same degree as the principal offender."). Indeed, our supreme court, in the defendant's appeal from his original jury conviction of premeditated first-degree murder, held "that the natural and probable consequences rule can be used to sustain a defendant's conviction for first-degree premeditated murder based upon criminal responsibility for the conduct of a co-defendant." *State v. Howard*, 30 S.W.3d 271, 273 (Tenn. 2000).

The intentional, premeditated, and deliberate nature of Claude Sharkey's actions in shooting the victim are best illustrated by his own testimony: "I asked for the money. [The victim] gave it to me, and I still shot him." *See West*, 844 S.W.2d at 147 (although "dispassionate intent to kill . . . requires more than a 'split-second' of reflection," no specific length of time is required for the formation of a "cool, dispassionate intent to kill"). Sharkey procured a firearm and used it to kill an unarmed, subdued victim. *See State v. Bland,* 958 S.W.2d 651, 660 (Tenn. 1997) (procurement of weapon and use of deadly weapon upon unarmed victim mentioned as circumstantial indicia of premeditation). Claude Sharkey, who testified that the robbery of the TGIF was his idea, evinced calmness immediately after the murder by returning to his house and playing video games with his friends. *See id.* (a defendant's calmness after a homicide may reflect that the act was done premeditatedly). Also significant as a reflection upon Sharkey's murderous intent is his testimony that, as he was leaving TGIF, he along with Wilson fired shots into a prone Preston Shea. Thus, we are able upon our review of the evidence to discern beyond a reasonable doubt that Claude Sharkey premeditatedly and deliberately killed Mr. Frieling.

The next issue is whether the defendant is guilty via a theory of criminal responsibility. Although the defendant, Wilson, and the Sharkeys testified that the defendant never left the car during the robbery, the jury heard eyewitness testimony that four intruders were involved.

The defendant's pretrial statement, admitted as evidence against him, articulates that the four persons who went to TGIF that night were Wilson, the two Sharkeys, and himself. Moreover, in his statement, the defendant said that the robbery was discussed among the men and that the guns were present in the car before they arrived at TGIF. The defendant stated that, after parking the car, "*we* went on and *walked up there*." (Emphasis added.) He stated that he stayed in the back. In his statement, he neither admitted nor denied that he possessed a weapon. He admitted that after the robbery, he returned to the Sharkeys' house and received $200 from the TGIF money, although a total of approximately $5,400 was stolen.

To be sure, the defendant offered evidence that he was either unaware of or a non-participant in the robbery and resulting crimes, but the jury, within its province as trier of fact and final arbiter of the credibility of witnesses and the weight to be assigned to their testimony, was free to reject the in-court claims of the Sharkeys, Wilson, and the defendant. Indeed, from the record before us, impeachment of the Sharkeys and Wilson via their prior inconsistent statements, *see* Tenn. R. Evid. 613(b), was palpable. Likewise, the jury was free to accredit the defendant's pretrial statement that he was the fourth intruder at TGIF on January 28, 1995. As such, in the light most favorable to the state, this evidence evinces the defendant's intent to promote or assist the commission of the robbery, the target crime, and that he aided or attempted to aid the others in committing the robbery. Based upon the trial court's instructions on criminal responsibility for the conduct of another, including instructions on the necessity of a finding that the resulting crime was a natural and probable consequence of the target crime, the jury obviously accredited the evidence inculpating the defendant and found that the homicide was a natural and probable consequence of the robbery. The evidence supports such findings. The defendant's conviction of premeditated first-degree murder is affirmed.

## II. Violation of Right of Confrontation.

Based upon *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968), the defendant challenges as plain error the propriety of a police officer's testimony about Kevin Wilson's pretrial statement. In *Bruton*, the Supreme Court established that a defendant's constitutional right to confront witnesses is violated when a co-defendant's pretrial statement which incriminates the defendant is introduced at a joint trial. *Id*. at 126, 88 S. Ct. at 1622.

When the officer in this case testified about the interrogation of the defendant, which led to a written, inculpatory statement, the officer mentioned that the defendant's statement was prompted by telling the defendant that Wilson had given a statement implicating the defendant. The officer then testified that the defendant asked to see Wilson's statement. The court allowed the officer to read portions of Wilson's statement in which Wilson implicated the defendant in the crimes. The trial court instructed the jury that Wilson's statement should not be used to determine the truth of Wilson's accusation of the defendant; rather, it could be used to "demonstrate what actions were taken by this officer to satisfy the questions of this defendant."

The defendant now argues that this procedure violated his right to confront Wilson as a witness against him. He asks this court to address the issue by noticing plain error because, at trial, he failed to object to the introduction of Wilson's statement until after a substantial portion of the statement had already been admitted into evidence. *See* Tenn. R. Evid. 103(a) (error may not be predicated upon a ruling admitting evidence unless a substantial right of the party is affected and "timely objection or motion to strike appears of record").

The state advances the arguments that the claim is indeed waived because of the lack of a timely objection and that, in any event, *Bruton* was not violated where the extrajudicial statement was not offered to prove the truth of the matter therein asserted. The state cites as the purpose of admitting Wilson's statement the objective of demonstrating what prompted the defendant's own statement. Adding interest to the issue is the defendant's calling as trial witnesses not only Wilson, but also Morgan and the two Sharkeys. In his appellate brief, the defendant claims that he was forced to call Wilson as a witness after the trial court admitted Wilson's statement in the state's case-in-chief.

As noted, the defendant did not timely object to the introduction of Wilson's statement; however, Tennessee Rule of Criminal Procedure 52(b) authorizes the appellate court to notice at any time an error affecting the defendant's substantial rights, though not properly raised on appeal, in the discretion of the appellate court "where necessary to do substantial justice." *See State v. Brooks*, 909 S.W.2d 854, 863 (Tenn. Crim. App. 1995) (double jeopardy issue recognized as plain error even though technically waived by procedural default); *State v. Thomas J. Faulkner, Jr.*, No. E2000-00309-CCA-R3-CD, slip op. at 11-13 (Tenn. Crim. App., Knoxville, Apr. 17, 2001) (appellate court declines to notice *Bruton* claims as plain error), *perm. app. denied* (Tenn. 2001). The Tennessee Supreme Court has adopted standards for evaluating whether an alleged error is proper for notice as plain error:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In *Smith*, the supreme court emphasized that "all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

The law has long recognized that "the right of cross-examination is included in the [Sixth Amendment] right of an accused in a criminal case to confront the witnesses against him." *Pointer v. Texas*, 380 U.S. 400, 404, 85 S. Ct. 1065, 1069 (1965). Thus, in *Bruton*, the High Court held that, in a joint trial where a co-defendant does not -- and cannot be compelled to -- testify, the prosecution's introduction of the co-defendant's extrajudicial statement which incriminates the defendant violates the defendant's "right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Bruton*, 391 U.S. at 126, 88 S. Ct. at 1622. The *Bruton* Court found constitutional error despite the trial court's instructions to the jury not to consider the co-defendant's statement in determining the guilt or innocence of the defendant. *Id.* at 136, 88 S. Ct. at 1628.

In the present case, we are underwhelmed by the state's asserted justification for introducing Wilson's statement, which was that the state wished to explain the officer's actions in eliciting the defendant's pretrial statement. We fail to see the materiality and relevance of explaining the officer's actions to the point of revealing the details of Wilson's statement. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). At any rate, assuming that Wilson's confession engendering the defendant's pretrial statement was a relevant and material fact, it had been established by the officer's testimony to that effect; there was no apparent need to delve into the substance of the statement. *See id.* 403 (relevant evidence may be excluded when the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").[1]

Thus, having rejected an "other purpose" rationale for admitting Wilson's extradjudicial statement, we move to a Confrontation Clause analysis of the issue. In *Crawford v. Washington*, 541 U.S. ___, 124 S. Ct. 1354 (2004), the United States Supreme Court held, "Where testimonial evidence[, such as statements resulting from police interrogation,] is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity

---

[1] Because we view the introduction of Wilson's extrajudicial accusations of the defendant to be irrelevant or, in any event, inadmissible pursuant to Rule 403, we do not analyze the issue whether the Sixth Amendment allows an "other purpose" exception to the general rule of excluding extrajudicial, testimonial statements made by an available declarant or made in the absence of a cross-examination opportunity. *See Crawford v. Washington*, 541 U.S. ___, ___, 124 S. Ct. 1354, 1374 (2004). We simply note that, although the hearsay rule would not be violated when the statement is not offered to prove the truth of the matter asserted, *see* Tenn. R. Evid. 801(c), the Sixth Amendment's ambit of protection is not necessarily coterminous with evidence law when the proposed extrajudicial statement is testimonial in nature, such as prior testimony at a preliminary hearing, before a grand jury, in a former trial, or resulting from police interrogations. *See generally Crawford*, 541 U.S. at ___, 124 S. Ct. at 1374. We question whether the non-hearsay use of Wilson's statement places the evidence beyond the reach of the Sixth Amendment. Likewise, although Tennessee Rule of Evidence 404(b) authorizes the use of evidence besmirching the defendant's character when the evidence is offered for a relevant purpose other than showing the defendant's propensity to offend, *see* Tenn. R. Evid. 404, we question whether the rigors of the Sixth Amendment are satisfied merely because those of Rule 404(b) have been met. *See Crawford,* 541 U.S. at ___, 124 S. Ct. at 1369 ("malleable [evidence-law] standard often fails to protect against paradigmatic confrontation violations"). In the present case, the defendant's claim of error is neither based upon the hearsay rule nor Rule 404; rather, it is based upon the Confrontation Clause embodied in the Sixth Amendment.

for cross-examination." *Id.* at ___, 124 S. Ct. at 1374.[2]  Thus, our analysis is directed by the two elements required for admitting against a defendant in a criminal trial a police interrogative statement: (1) that the extrajudicial declarant was unavailable at the time of trial, and (2) that the defendant on trial had a prior opportunity to cross-examine the declarant.

### a. Unavailability.

In the present case, Wilson was obviously physically available; he appeared at trial and testified on behalf of the defendant.  The question that arises is whether he was rendered unavailable because of the possibility that he might assert his privilege against self-incrimination. *See* U.S. Const. amend. V; *Breeden v. Independent Fire Ins. Co.*, 530 S.W.2d 769, 775 (Tenn. 1975) (for purposes of applying the hearsay rule exception for statements made against pecuniary or penal interests, court ruled that an extrajudicial declarant is unavailable who "is present in court and refuses to testify on the ground of self-incrimination").  We know that, in the classic *Bruton* scenario, the co-defendant/declarant is unavailable because he is a defendant in a joint trial, a circumstance whereby the state is forbidden to force him to testify.  *See, e.g., Schmerber v. California*, 384 U.S. 757, 761, 86 S. Ct. 1826 (1966) (stating that the Fifth Amendment privilege against self-incrimination under our United States Constitution "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature"); *State v. McAlister*, 751 S.W.2d 436, 440 (Tenn. Crim. App. 1987); *see also State v. Gilbert*, 751 S.W.2d 454, 463 (Tenn. Crim. App. 1988) (defendant electing to testify in support of his defense and taking the witness stand  waives his "constitutional rights, federal and state, against self incrimination as to matters which were relevant, material and germane to the issues which the jury would be required to resolve").

In the present case, the state could have compelled Wilson to take the witness stand. *See State v. Dooley*, 29 S.W.3d 542, 551 (Tenn. Crim. App. 2000) (witness who is not criminal defendant may not assert privilege against self-incrimination to defeat compulsory process to testify but is relegated to asserting the privilege in response to specific questions).  Had he testified for the state, Wilson would not have enjoyed the privilege against self-incrimination with respect to the homicide on trial because, according to his testimony, he had been convicted of first-degree murder in the killing of Mr. Frieling.  It also appears that his conviction was the result of a guilty plea.  *See Howard*, 30 S.W.3d at 275 n.5.  The upshot is that, having been finally convicted of the murder, he apparently had no basis for a claim of privilege against self-incrimination.  *See State v. Barone*, 329 Or. 210, 986 P.2d 5, 20-21 (Or. 1999).

Moreover, the burden of showing the unavailability of a witness typically rests upon the proponent of the witness -- in this case, the state. *See State v. James Roy McCoy,* No. 01-C-01-

---

[2]In addition to illustrating examples of "testimonial" evidence (testimony given at prior judicial proceedings and statements resulting from police interrogation), *Crawford* defines a "testimonial" statement as one "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at __, 124 S. Ct. at 1364, 1374.

9103-CR-00090 (Tenn. Crim. App., Nashville, Nov. 21, 1991). All in all, the record fails to establish that Wilson was unavailable, and as such, the state's use of his statement accusing the defendant of the crimes on trial was *a priori* a violation of the defendant's Sixth Amendment rights.

### b. Cross-examination opportunity.

In *Crawford*, the Supreme Court said that the use of extrajudicial, testimonial statements, is dependent not only upon the unavailability of the declarant, but also upon the existence of "a *prior* opportunity for cross-examination." *Crawford*, 541 U.S. at ___, 124 S. Ct. at 1374 (emphasis added). Despite the requirement of a "prior" opportunity to cross-examine, we recognize that, for nearly as long as *Bruton* has been on the books, the declarant's ultimate live testimony in the case on trial cures any possible Sixth Amendment violation. *See generally Nelson v. O'Neil*, 402 U.S. 622, 91 S. Ct. 1723 (1971).

In *O'Neil*, a federal *habeas corpus* action, the petitioner had been tried jointly with a co-defendant whose extrajudicial confession was introduced by a police officer. The confession incriminated the petitioner. *Id.* at 623-25, 91 S. Ct. at 1724-25. After the state closed its case-in-chief at trial, the co-defendant testified in his own defense; he denied making the extrajudicial statement and denied the truth of the matters asserted therein. *Id.* at 625, 91 S. Ct. at 1725. In rejecting the petitioner's bid to overturn his conviction based upon *Bruton*, the Court held that "where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments." *Id.* at 629-30, 91 S. Ct. at 1727. *See also McCracken v. State*, 548 S.W.2d 340, 343 (Tenn. Crim. App. 1976) (*Bruton* "not applicable when the confessing defendant testifies and the non-confessing defendant has an opportunity to cross-examine him"); *State v. Eakins*, 776 S.W.2d 134, 135 (Tenn. Crim. App. 1989) (*Bruton* "applicable only to joint trials in which there is admitted into evidence a non-testifying co-defendant's confession inculpating the defendant").

*O'Neil* demonstrates that the appellate courts should evaluate the confrontation problem from a perspective of the entire trial, viewing what transpired after the extrajudicial statement was introduced and not merely analyzing the introduction of the statement in isolation. In *O'Neil*, the state had closed its case-in-chief, and although O'Neil had no power to command his co-defendant to testify, his cross-examination and confrontation interests were nevertheless served by the co-defendant ultimately taking the stand and denying the truth of the statement attributed to him, coupled with O'Neil's opportunity to cross-examine the co-defendant. The co-defendant's testimony as described above removed his privilege against self-incrimination as a bar to O'Neil's cross-examination of him and allowed him to be cross-examined by O'Neil.

The same is true in the present case. Even though the state had closed its case-in-chief that included evidence that might have flowered into a *Bruton* violation, the defendant called and questioned the obviously available Wilson, as well as Morgan and the two Sharkeys. On direct examination, Wilson (and the Sharkeys) testified favorably to the defendant and maintained that the

defendant did not join in the scheme to rob TGIF. Although Wilson generally admitted making the pretrial statement that had placed the defendant inside TGIF during the robbery and assaults, he denied the truth of the statement. The defendant attempted to buttress Wilson's trial testimony with the strikingly similar testimony of the Sharkeys. Based upon *O'Neil*, the defendant's interest in confronting Wilson, as the author of the complained-of pretrial statement, was to elicit testimony favorable to the defendant and in contradiction of the extrajudicial statement.

Thus, based upon *O'Neil*, we hold that the defendant's calling and use of Wilson as a favorable witness cured the pending Sixth Amendment violation. Alternatively, the admission of Wilson's statement was harmless error beyond a reasonable doubt. *See* Tenn. R. Crim. P. 52(a); *Cruz v. New York,* 481 U.S. 186, 193, 107 S. Ct. 1714, 1719 (1987) (confrontation violation subject to harmless-error analysis). Wilson and the Sharkeys testified and variously denied making portions of their respective statements and/or advanced the claim that Morgan was the fourth intruder in TGIF, not the defendant. The defendant affirmatively chose to insert this testimony as substantive evidence of his innocence.[3] In this situation, the use of Wilson's pretrial statement in the state's case-in-chief constitutes harmless error beyond a reasonable doubt. As such, we decline to notice plain error.

In passing, we are unpersuaded by the defendant's claim in his appellate brief that he was compelled to call Wilson and the Sharkeys to testify because the trial court had erroneously admitted Wilson's statement. *See State v. Kerley*, 820 S.W.2d 753, 757 (Tenn. Crim. App. 1991) ("conclusory statements made by counsel in petitioner's brief are not evidence"). Even though the tactic to call these witnesses may have been disastrous, the witnesses were called amidst the *Bruton-O'Neil* legal context above described. The officer's testimony would not be reviewed in isolation, and regardless of the defendant's motive for calling the witnesses, the substance and effect of Wilson's live testimony, in particular, was destined to contribute to the *Bruton* analysis. Against this context, the defendant's motive for calling Wilson and the Sharkeys is not dispositive. At any rate, the record does not establish the motive for calling Wilson as a defense witness.

### III. Principles of Double Jeopardy As a Bar to Retrial of the Counts of Felony Murder.

The defendant claims that principles of double jeopardy bar his retrial for and convictions of felony murder. In the defendant's original trial, he was indicted on three different counts of first-degree murder for the killing of Mr. Frieling: premeditated murder in the first count, felony murder committed in the perpetration of a robbery in the second count, and felony murder in the perpetration of burglary in the third count. He was also charged with especially aggravated robbery and conspiracy to commit aggravated robbery. *See generally Howard*, 30 S.W.3d 271. In *Howard*, the supreme court explained the trial court's treatment of the homicide charges in the original trial:

---

[3]The record includes a *voir dire* examination of the defendant wherein he acknowledged the advice of counsel not to call Wilson and the Sharkeys as witnesses and affirmed his desire to call them, despite counsel's contrary advice.

At the conclusion of the evidence, with regard to the counts of premeditated murder and felony murder, the court instructed the jury to consider the charges in the following sequence: (1) first-degree premeditated murder; (2) first-degree murder during the perpetration of a robbery; (3) first-degree murder during the perpetration of a burglary; (4) facilitation of first-degree premeditated murder; (5) facilitation of first-degree murder during the perpetration of robbery; and (6) facilitation of first-degree murder during the perpetration of burglary. The court instructed the jury that after it reached a verdict with regard to first-degree murder on any of the above theories, it should proceed directly to deliberate on the remaining charges of especially aggravated robbery and conspiracy. Thus, if the jury convicted Howard of premeditated first-degree murder, they were not to consider felony murder or facilitation of first-degree or felony murder. . . .

. . . .

The jury convicted Howard of premeditated murder, especially aggravated robbery, and conspiracy to commit aggravated robbery.

*Id.* at 274-75.

On remand, despite the absence of verdicts on the felony-murder charges in the original trial, the defendant was again tried on the three first-degree murder charges, and the jury in the second trial returned guilty verdicts in all three first-degree murder counts.

Double jeopardy principles embodied in the Fifth Amendment to the United States Constitution protect defendants from twice being placed in jeopardy for the same offense by barring (1) a second prosecution for the same offense following acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969); *Benton v. Maryland*, 395 U.S. 784, 89 S. Ct. 2056 (1969); *see also* Tenn. Const. art. 1, § 10; *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996). Moreover, a trial proceeding that is terminated without an acquittal or conviction may bar a subsequent prosecution for the same offense. For instance, when a mistrial is declared without the consent of the accused and without the manifest necessity of a mistrial, retrial is barred. *State v. Skelton*, 77 S.W.3d 791, 798-99 (Tenn. Crim. App. 2001).

*Skelton* adjudicated a double jeopardy issue very similar to the one at bar. Defendant Skelton was tried on charges of attempted first-degree murder and aggravated assault, the charges growing out of one assault committed upon one victim. Based upon Skelton's guilty plea to aggravated assault, the jury convicted him of that offense but reported that it had reached no verdict on the attempt to commit first-degree murder charge. *Id.* at 794-95. Hearing that report, the trial

court *sua sponte* discharged the jury. *Id*. at 795. Subsequently, the state sought to bring the defendant to trial again for attempt to commit first-degree murder, and the defendant obtained an interlocutory appeal to have the retrial barred on principles of double jeopardy. *Id.* at 796. This court held that "the termination of [the original] trial proceedings, without a finding that a manifest necessity existed to do so, and without the defendant's request or consent, was improper [and was] an acquittal for purposes of double jeopardy." *Id.* at 797. The court barred Skelton's retrial for attempt to commit first-degree murder.

*Skelton* controls the present case. The defendant suffered the attachment of jeopardy on the charges of felony murder in the first trial, and that proceeding ended upon the discharge of the jury without verdicts being rendered. As in *Skelton*, the defendant had "virtually nothing to object to" and cannot be deemed to have consented to the termination of the trial on the felony-murder charges. *See id.*, 77 S.W.3d at 800 (accused must have "realistic opportunity to object, prior to a trial court's *sua sponte* declaration of a mistrial"; appellate court will not presume a realistic opportunity to object in the face of a record that inadequately reflects the original proceedings).

Furthermore, we discern in the record no hint of a manifest necessity to discharge the original jury without verdicts on the felony-murder charges. We point out that in *Howard*, the defendant's appeal from his original trial, our supreme court commented that the trial court should have allowed the jury to consider "all theories of first-degree murder." *Howard*, 30 S.W.3d at 274 n.4. The court said that when a jury returns guilty verdicts on more than one theory of a single first-degree murder, the trial court should then resolve the double jeopardy issue by merging the offenses and imposing "a single judgment of conviction." *Id.* The court noted that such a procedure eliminates "the *double jeopardy problem* of retrying a defendant after a subsequent appellate opinion reverses [the imposed conviction]." *Id.* (emphasis added). Essentially, on direct appeal from the original trial, the supreme court saw no reason for discharging the jury without verdicts on the felony- murder charges, and neither do we see a reason -- much less a necessity -- in the record before us. Thus, in the present case, the double jeopardy "problem" must now be solved by vacating the convictions of felony murder and dismissing those charges.

IV. Jury Instructions.

The defendant claims that the trial court erred in instructing the jury on the lesser-included offense of second-degree murder. He argues that the court should have given the second-degree murder charge suggested by this court in *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002). In *Page*, this court reversed a conviction of second-degree murder, a result-of-conduct crime, because the trial court instructed the jury that a person acts knowingly if the person acts with merely an awareness that his conduct is of a particular nature or that particular circumstances exist rather than instructing that the person acts knowingly, for purposes of a result-of-conduct crime, only when the person is aware that the conduct is reasonably certain to cause the result. *Id.* at 788. The *Page* court suggested the following jury charge regarding the offense of second-degree murder:

Any person who commits second-degree murder is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victim; and

(2) that the defendant acted knowingly.

"Knowingly" means that a person acts with an awareness that [his][her] conduct is reasonably certain to cause the death of the alleged victim.

The requirement of "knowingly" is also established if it is shown that the defendant acted "intentionally."

"Intentionally" means that a person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim.

*Id.*

The defendant seems to argue not that the holding in *Page* was violated by the trial court's then-conventional, briefer charge on second-degree murder, but that the use of the *Page* second-degree-murder charge would have facilitated a better chance of a diminished capacity argument with respect to second-degree murder.

We need not fathom the argument too deeply, however, because the claim is moot. The trial court rendered sequential jury instructions; the jury was instructed to consider first-degree murder before considering the lesser-included offenses and that a conviction of first-degree murder pretermitted consideration of any lesser-included offense. The jury is presumed to have followed the court's instruction. *See State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001). In this situation, when the jury did not consider the offense of second-degree murder, any instructional error is harmless beyond a reasonable doubt. *See State v. Douglas Marshall Mathis*, No. M2002-02291-CCA-R3-CD, slip op. at 6-7 (Tenn. Crim. App., Nashville, Mar. 3, 2004), *perm. app. denied* (Tenn. 2004); *State v. Robert Faulkner*, No. W2001-02614-CCA-R3-DD, slip op. at 30-33 (Tenn. Crim. App., Jackson, Sept. 26, 2003). Thus, we reject the defendant's claim of error in the trial court's instructions on second-degree murder.

## V. Failure to Recuse.

The defendant claims the trial judge erred in failing to grant his pretrial motion for the judge to disqualify himself from presiding over the defendant's second trial. The defendant bases his claim for disqualification merely upon the fact that the judge presided over the defendant's first

trial. He cites no authority to support the claim that a judge's presiding over a previous trial that resulted in a reversal on appeal *ipso facto* disqualifies the judge from presiding over the new trial.

Recusal is appropriate whenever a trial judge's impartiality can be reasonably questioned. Tenn R. Sup. Ct. 10, Code of Judicial Conduct, Canon 3(E)(1); *State v. Cash*, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993). A trial judge's denial of a motion to recuse will be upheld absent a showing of abuse of discretion. *Cash*, 867 S.W.2d at 749. Reasons which warrant recusal include:

> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it.

Tenn. R. Sup. Ct. 10, Code of Judicial Conduct, Canon 3E(1)(a), (b).

We find nothing in the record that suggests that the trial court abused its discretion in overruling the motion to recuse. We know of no rule of law that compels the recusal of or disqualifies a trial judge merely because the judge presided over a previous trial in the same case, and the defendant has cited no law to that effect. Therefore, this claim of error is unsupported both factually and legally.

## VI. Cumulative Errors.

In the defendant's next argument for reversal, he claims that cumulative errors require reversal of his convictions. We have already reversed his convictions of felony murder based upon principles of double jeopardy. Those principles in no way impugn the conviction of premeditated murder. Moreover, we have discerned no reversible Confrontation Clause error or other error. Thus, there exist no errors to accumulate.

## VII. Sentencing.

In the defendant's final issue, he claims that the trial court erred in imposing his first-degree murder sentence to run consecutively to his previous sentences for especially aggravated robbery and conspiracy to commit aggravated robbery.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This

presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." *Id.* In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id.* If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing and after determining the range of sentence and the specific sentence, then determines the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b) (2003); *id*. § 40-35-103(5) (2003); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

Consecutive sentencing may be imposed in the discretion of the trial court upon a determination that one or more statutory criteria exist, and the criterion used in the present case is that the "defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2003). In *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995), *limited by State v. Lane*, 3 S.W.3d 456 (Tenn. 1999), the supreme court imposed two additional requirements for consecutive sentencing under the dangerous-offender category -- the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct.

The trial court's application of the dangerous-offender category to the defendant was expressed in terms of a strong denunciation of the actions of Claude Sharkey and Kevin Wilson, the persons who shot the victims during the robbery. The trial judge spoke eloquently of these two men appearing in court to testify and showing no remorse upon seeing Mr. Shea present in the courtroom. Indeed, Sharkey's and Wilson's actions define them as dangerous offenders. The trial court, however, did not differentiate between the defendant as an accomplice, on the one hand, and Wilson and Sharkey, on the other.

This court has previously upheld the imposition of consecutive sentencing based upon the following facts.

> Each of the robberies was committed at a retail store open to the public. The Defendant provided the gun for six robberies and one attempted robbery. The Defendant himself pointed the gun at one of

-17-

the convenience store clerks who was robbed. *The same gun was used in the final attempted robbery by the Defendant's accomplice, during which shots were fired and the accomplice was shot.* There is no question that armed robberies of convenience stores frequently result in loss of life. The Defendant's *repeated* participation in these crimes earned him the sobriquet, "dangerous offender."

*State v. Kenny Carson Cockrell, Jr.,* No. W2002-00545-CCA-R3-CD, slip op. at 4-5 (Tenn. Crim. App., Jackson, Apr. 2, 2003) (emphasis added); *see also State v. Barry F. Braden*, No. M2001-00226-CCA-R3-CD, slip op. at 16-17 (Tenn. Crim. App., Nashville, Jul. 26, 2002) (although the defendant had no prior adult criminal record, dangerous-offender classification upheld when, during a five-day period, defendant and accomplices perpetrated two robberies, both of multiple victims, with the use of a gun) *perm. app. denied* (Tenn. 2002). In the present case, however, even in the version of events most favorable to the state, the defendant participated in only one robbery and his role, compared to that of Claude Sharkey and Wilson, was relatively passive.

The presentence report in this case reveals that the eighteen-year-old defendant possessed a criminal conviction record of aggravated burglary and a juvenile record of two adjudications of aggravated burglary, two adjudications of theft, and an adjudication of possession of marijuana with intent to sell. Thus, prior to the invasion of TGIF, the defendant had been previously convicted or adjudicated guilty of four aggravated burglaries – burglaries of "buildings . . . designed or adapted for the overnight accommodation of persons." *See* Tenn. Code Ann. § 39-14-401(1)(A) (2003) (defining habitation); *id.* § 39-14-103(a) (2003) (proscribing aggravated burglary as burglary of a habitation). This court has characterized burglaries of habitations as "particularly dangerous," *see, e.g., Ernest Lee Lands v. State*, No. 03C01-9404-CR-00145, slip op. at 4 (Tenn. Crim. App., Jackson, May 19, 1995), *perm. app. denied* (Tenn. 1995), and has "recognized that the potential for bodily injury to the victim is great when [aggravated burglaries] are committed," *State v. David Scarbrough*, No. E1998-00931-CCA-R3-CD, slip op. at 25 (Tenn. Crim. App., Knoxville, Jul. 11, 2001), *perm. app. denied* (Tenn. 2002). The defendant's four previous aggravated burglary offenses bespeak a lack of regard for human life.

Moreover, this court has previously upheld the imposition of consecutive sentences despite the defendant's guilt via a theory of criminal responsibility. *State v. Carl Preston Durham*, No. E1999-02640-CCA-R3-CD, slip op. at 39 (Tenn. Crim. App., Knoxville, Apr. 12, 2001) (consecutive sentences of life and fifteen years not excessive, disproportionate, or cruel and unusual punishment, despite defendant's passive role in the homicide), *perm. app. denied* (Tenn. 2001). Given the defendant's penchant for committing aggravated burglaries and the nature and circumstances of the conviction offense in the present case, we are loath to conclude that the trial court abused its discretion in imposing consecutive sentencing. We hold that the record supports the sentencing determination.

VIII.  Conclusion.

We reverse the defendant's convictions of felony murder and dismiss those charges.
We affirm his conviction of premeditated murder and the imposition of consecutive sentencing.

_____
JAMES CURWOOD WITT, JR., JUDGE